PHILIP A. WILLIAMS v. J. ELMO JONES, BENJAMIN F. CRAVEN, AND FACTORY AUTOMATORS, INC.

No. 538A87

(Filed 6 April 1988)

**Contracts § 27.1— oral agreement—formation of new corporation—sufficiency of evidence**

The evidence was sufficient to permit the jury to find that plaintiff and the individual defendants entered into a valid oral contract to form a new corporation capitalized by the individual defendants which would have the exclusive right to sell plaintiff's factory automation systems in that the evidence was sufficient to support findings that (1) there was an offer and acceptance of terms to capitalize a new corporation at a meeting attended by the parties on a specified date, and (2) the terms agreed upon were sufficiently definite and certain to give rise to an enforceable contract.

APPEAL by plaintiff pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 87 N.C. App. 178, 360 S.E. 2d 298 (1987), affirming the judgment notwithstanding the verdict entered by *Albright, J.*, at the 14 April 1986 session of Superior Court, GUILFORD County. Heard in the Supreme Court 9 February 1988.

*Nichols, Caffrey, Hill, Evans & Murrelle, by R. Thompson Wright, for plaintiff-appellant.*

*Gabriel, Berry, Weston & Weeks, by M. Douglas Berry, for defendant-appellees.*

MARTIN, Justice.

This case comes before us on the issue of whether the trial judge erred in entering judgment notwithstanding the verdict. We hold that he did err, and for the reasons explained below, we reverse the Court of Appeals and reinstate the jury verdict.

The evidence presented at trial, taken in the light most favorable to the plaintiff, shows that plaintiff went into business for himself in 1977 as a designer and purveyor of computer systems used to automate factory operations. Plaintiff's capital was intellectual rather than monetary, consisting of a 1972 mechanical engineering degree and five years' experience designing and selling industrial automation systems. By 1983 plaintiff's efforts had produced mixed results. On the one hand, substantial growth and financial success were almost within his grasp. On the other hand, he lacked the capital necessary for the month-to-month operation of his expanding business and for the further expansion which his ambitious plans required. The nature of his business was such that considerable capital outlay was made by his company in the course of fulfilling each order — designing the software, obtaining the hardware, installing the system in operational order, and teaching the client's worker to use the equipment — before the client was billed and the investment, along with a profit, was recouped. Thus, the more successful his salesmanship was, the greater his anxiety about being able to pay his suppliers and meet his payroll.

Late in 1979 or early in 1980, plaintiff met Benjamin F. Craven, later a defendant in this suit. Craven, a certified public accountant, operated a business called Craven Venture Management. He specialized in raising capital for businesses and also acted as an all-purpose financial consultant. Plaintiff first turned to him for help in securing a bank loan and thereafter relied upon the older man for advice and aid with business problems which took him outside his competence in technical matters and sales. It was Craven, for example, who advised plaintiff to do business

under a second corporate aegis, Symex Factory Automation, Inc., in addition to the original, Symex, Inc. The purpose of these maneuvers was to insulate the new corporation from the indebtedness to suppliers which plagued Symex, Inc., and thus to make it more attractive to potential investors. These and other palliatives were not wholly successful, and by July 1983 the Symex companies were facing a choice between finding sources of capital infusion or bankruptcy.

In July 1983 defendant Craven told plaintiff that defendant J. Elmo Jones, who had recently sold his business and retired, was interested in investing in the Symex companies. Jones had met plaintiff some weeks before, discussed plaintiff's business with him, and travelled with him to some Symex job sites to get the flavor of the business, which was entirely alien to his own business experience in textiles. Plaintiff developed some sales projections, working with his accountant, Michael Dimoff. Plaintiff projected that his business could anticipate seven large orders over the following twelve months, averaging $125,000 each, yielding roughly one million dollars in sales for the twelve-month period. Dimoff and Craven worked up a financial portrait of the Symex companies to show Jones.

On 7 July 1983, plaintiff, Dimoff, Jones, and Craven met in Craven's office. All participants at this critical morning meeting testified at the trial, but their testimony was conflicting. Plaintiff and Dimoff testified that the meeting produced a verbal agreement between plaintiff and defendants Jones and Craven to form a new company, Factory Automators, Inc., which Jones and Craven would capitalize, and that the parties hammered out an understanding on the essential terms of the agreement. Collateral matters were to be worked out later, and the agreement in full was to be memorialized in writing at a later time.

Plaintiff and Dimoff testified that at the 7 July 1983 meeting the following terms were agreed upon: (1) Plaintiff was to bankrupt Symex, Inc., and liquidate Symex Factory Automators. (2) Craven and Jones would each contribute $50,000 equity capital in exchange for stock. (3) Plaintiff would contribute his technology. (4) The technology would remain plaintiff's but would be available to the new company under precisely the same licensing arrangements as had existed between plaintiff and Symex. (5) Plain-

tiff would devote his full-time sales efforts to the new company. (6) The new company would employ former Symex employees Joe Kline and Kathy Carpenter, their employment contracts to contain noncompetition and secrecy agreements. (7) Plaintiff was to receive 50 percent of the common stock when retained earnings of the company reached $200,000; he was to receive a pro rata share of this 50 percent as retained earnings approached the $200,000 level. Plaintiff testified that he accepted the terms, that Joe Kline and Kathy Carpenter were called in and told of the agreement, and that the whole party then went to the Starmount Country Club for a celebration lunch.

Jones and Craven deny that they agreed to the above-listed terms at the 7 July 1983 meeting or at any time thereafter. They testified that a meeting or meetings took place sometime in July or August but produced nothing more than a preliminary agreement or an "agreement to agree." According to their testimony, these negotiations left open essential terms necessary to define the business relationship into which the parties contemplated entering. They claim that the deal under discussion included a possible incentive stock bonus of 50 percent if plaintiff's sales efforts were sufficiently fruitful, not payment for his contributed technology. Jones and Craven claim that plaintiff's "technology" was worth little and that the genuinely valuable technical work done in either the Symex companies or the newly formed company was done entirely by Joe Kline. They deny that any clear agreement existed between the parties as to when plaintiff was to receive stock. Additionally, they deny that either licensing agreements for plaintiff's technology or noncompetition agreements for key employees was even discussed, much less agreed upon. Finally, they deny that they agreed to capitalize the new corporation in the form of supplying equity capital. What each defendant in fact did supply, in exchange for the company's stock, was $1,000 in cash and a $50,000 bank loan, for which the corporation was liable.

All parties agree on the following: Although the parties looked to an eventual written agreement, none was ever signed by any of the parties. Despite the absence of the anticipated written agreement, the parties did in fact go forward and create a new company, Factory Automators, Inc., which sold the technology which had been the stock-in-trade of the Symex com-

panies. Plaintiff bankrupted Symex, Inc., and liquidated Symex Factory Automators in July. He immediately went to work as the sales representative of the new company, Factory Automators, Inc., and employed the two other key employees who had been on the Symex payroll. Jones was its president. It was capitalized by Jones and Craven.

Plaintiff began working in sales under Jones' direction in August 1983. In the same month he was presented with a document labeled "Preliminary Draft," which purported to set down the agreement between the three parties. Plaintiff was alarmed because it contained no reference to what he considered to be key terms—in particular, his license for his technology and non-competition and secrecy agreements for key employees—while it introduced terms not part of the oral agreement—in particular, it referred to a stock incentive bonus plan for himself. Plaintiff never signed the agreement. Relations between Jones and plaintiff deteriorated rapidly. Jones became convinced he had bought a "lemon." He tried vainly and with decreasing patience to reform plaintiff's sales approach, to bring it into line with his own ideas of good salesmanship based on a lifetime in the textile industry. Jones fired plaintiff in June 1984. Plaintiff asked to be allowed to remove his materials from the premises of Factory Automators. The request was denied. Plaintiff left the company with no stock, no licenses, and no technical product he could sell in a new business venture. Craven and Jones continue to operate the company, claiming that due to a combination of Joe Kline's technical expertise and the sales efforts of a new representative, the company has been turned around.

At trial the parties disputed the value of plaintiff's sales efforts during the months that he represented Factory Automators. Plaintiff contended that he met or exceeded the seven-large-order, million-dollar projection he had made in July 1983 when negotiations were underway. He presented evidence that the seven orders were in fact booked before he left the company and before the twelve-month period was concluded. Defendants countered that the projection was vastly inflated relative to the actual sales plaintiff had been able to achieve. The record reveals that the dispute between the parties devolves into a question about the proper method of accounting to be used in recording sales. Defendants employed the so-called "completed contract"

method of accounting, which does not count an order until the job is completed. Plaintiff used the method of counting orders that had been booked. Since typically the jobs done by the company took considerable time and outlay to complete, the different accounting methods produced very discrepant pictures of plaintiff's sales effectiveness. Plaintiff contended that his two financial backers well understood that the business could not be profitable in its first year of operation at the time that the two sides engaged in negotiation. Jones and Craven insisted that they were led to expect a profitable operation in the first year and that plaintiff's performance met neither his projections nor their legitimate expectations.

The case proceeded to trial upon plaintiff's claim for rescission of the contract, and the court submitted five issues to the jury: (1) whether plaintiff entered into a contract with defendants Jones and Craven; (2) if so, whether these defendants substantially breached the contract; (3) whether plaintiff contributed any property of value to the corporation at the time it was organized; (4) whether the property can be returned in kind; and (5) the fair market value of the property so contributed. The jury returned a verdict answering the above five issues in plaintiff's favor and awarded plaintiff damages in the amount of $150,000. The court also submitted an issue to the jury on defendants' counterclaim, asking in what amount, if any, plaintiff was indebted to the defendants. The jury found for the defendants on the counterclaim in the amount of $1,000.

Following the jury verdict the trial court granted defendants' motion for judgment notwithstanding the verdict. Plaintiff appealed to the Court of Appeals, a majority of which affirmed the trial judge's granting of the motion. Judge Phillips dissented on the grounds that the evidence presented a question for the jury of whether there was a binding oral contract. Plaintiff filed notice of appeal to this Court based on Judge Phillips' dissent, pursuant to N.C.G.S. § 7A-30(2).

The sole question before us is whether the evidence presented at trial was sufficient to submit to the jury the issue of whether there was a binding oral contract between plaintiff and Jones and Craven. The standard to be employed by a trial judge in determining whether to grant a judgment notwithstanding the ver-

dict is the same standard employed in ruling on a motion for a directed verdict. The judge must consider the evidence in the light most favorable to the nonmovant and may grant the motion only if, as a matter of law, the evidence is insufficient to justify a verdict for the nonmovant. *Dickinson v. Pake*, 284 N.C. 576, 201 S.E. 2d 897 (1974). All conflicts in the evidence are to be resolved in the nonmovant's favor, and he must be given the benefit of every inference reasonably to be drawn in his favor. *Daughtry v. Turnage*, 295 N.C. 543, 246 S.E. 2d 788 (1978). Conflicts, contradictions, and inconsistencies are to be resolved in the nonmovant's favor. *Summey v. Cauthen*, 283 N.C. 640, 197 S.E. 2d 549 (1973).

After carefully reviewing the trial transcript, we conclude that the evidence, so viewed, would permit a jury to find that at their 7 July 1983 meeting plaintiff and defendants Jones and Craven entered into a valid oral contract to form a new corporation to sell plaintiff's technology. Our analysis divides into two subparts: (1) was there sufficient evidence for the jury to find there was an offer and acceptance of terms to capitalize a new corporation at the 7 July meeting, and (2) if so, were the terms agreed upon sufficiently definite and certain to give rise to a contract enforceable by a court of law? We will address these subparts in turn.

This Court has long stated the general test for the existence of a contract. In *Overall Co. v. Holmes*, 186 N.C. 428, 119 S.E. 817 (1923), this Court said: "A contract is 'an agreement, upon sufficient consideration, to do or not to do a particular thing.'" *Id.* at 431, 119 S.E. at 818 (quoting 2 W. Blackstone, *Commentaries* *442). The trial record clearly presents evidence from which a jury could conclude that the 7 July 1983 meeting produced a binding oral contract to form a new company capitalized by Jones and Craven, which would have the exclusive right to sell plaintiff's factory automation systems. The testimony of plaintiff and accountant Dimoff showed that a firm offer was made to supply $100,000 in capital in exchange for the right to sell the technology. The protestations of Jones and Craven that nothing more than preliminary negotiations were discussed merely contradicted plaintiff's testimony. Indeed, the testimony of plaintiff and Dimoff showed that they, along with key employees Kline and Carpenter, who had just been hired for the new enterprise, were taken by Jones to his country club for a lunch to celebrate the

deal. Objective circumstances supported the testimony. Plaintiff did dissolve the two Symex companies and he immediately put all the technical materials that had been in use at the Symex companies into the custody of the new entity. Although Jones and Craven disparaged the commercial value of these materials, they refused to allow plaintiff to take them from the corporate premises when he was fired. Defendants continue to market the product that plaintiff developed. Defendant Jones testified that once rid of plaintiff's deleterious participation, the company was turned around and ceased to be a "lemon." We conclude that the evidence was sufficient to support a jury finding of an offer and acceptance.

We come now to the question of whether the terms agreed upon at the 7 July 1983 meeting were sufficiently definite and certain to be enforceable.

> There is no contract unless the parties assent to the same thing in the same sense. A contract is the agreement of two minds — the coming together of two minds on a thing done or to be done. "A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree."

*Overall Co. v. Holmes,* 186 N.C. at 431-32, 119 S.E. at 818-19 (quoting *Prince v. McRae,* 84 N.C. 674, 675 (1881)).

Defendants argue that even if there were evidence sufficient to find that the parties made an oral contract, the terms supposedly agreed to were too vague, uncertain, and indefinite to constitute an enforceable contract. We disagree. A jury could find based upon plaintiff's testimony, as corroborated by Dimoff, that the parties reached a clear and definite agreement as to the details of the contract. The evidence discloses the understanding that each of the parties had of the motivations and interests of the opposing party or parties, as expressed at the 7 July 1983 meeting or in prior discussions between the parties. The evidence presented by plaintiff showed that he was a man with two objectives in making an agreement with Jones and Craven: (a) to maintain substantial ownership of his company and (b) to maintain

control of his technology. Plaintiff testified that certain terms *not* discussed were simply not material to him; for example, he did not care to bargain for salary. He was prepared to accept any salary which would cover his living expenses.

Plaintiff described his reaction to being told by defendant Craven that defendant Jones was interested in investing in the following terms:

> I had concerns about Elmo. I was afraid that—I wanted Ben to know that I wanted no part of any deal where I might lose my company. I wanted no part of any deal where I wouldn't control my technology. . . . Ben stated specifically, "Phil, I've known Elmo for X years, you know. . . . He doesn't want any part of your business. He'd like to help you out. I can promise you Elmo won't take your business," and I must have beat that thing to death, because I wanted no part of it. We must have talked about that for thirty minutes.

Plaintiff's testimony revealed that he regarded only two financial terms as essential to the agreement and that these terms were agreed to by all parties at the 7 July 1983 meeting. In recognition of the value of his contributed technology, he was to receive 50 percent of the new company's stock when retained earnings reached $200,000 and would receive stock on a pro rata basis as the $200,000 level was approached. Jones and Craven agreed to put up $50,000 each in equity capital. They responded that what they had envisioned was an incentive stock bonus plan for plaintiff, details to be worked out later, and had not agreed to stock in compensation for his technology. Moreover, Jones and Craven insisted that they believed that plaintiff would make provision out of his potential 50 percent of the common stock for stock bonuses or incentives for Joe Kline and Kathy Carpenter. There is nothing vague or indefinite about plaintiff's testimony as to the stock deal he was offered, although it was strenuously contested by the defendants.

Defendant Craven denied that there had been an agreement to fund the new company in the form of equity capital, and defendant Jones went so far as to insist that he had not known what was meant by "equity capital" when the parties met on 7 July 1983. Plaintiff testified that he had wanted and gotten an agreement to supply equity capital because he feared that major

corporations would refuse to buy from his company unless it could demonstrate it possessed significant assets. Plaintiff had discovered when he operated the Symex companies that potential buyers would doubt a debtor firm had the financial stability to stay in business to complete its projects. Again, there is nothing vague or indefinite about the term "$100,000 of equity capital." The issue for the jury was, rather, that of the credibility of the parties.

Plaintiff testified that maintaining control of his technology was of paramount importance to him and that he had stressed this issue in discussions with both Jones and Craven prior to 7 July 1983 and had sought terms to effect his purpose at the 7 July meeting. He had discussed what he refers to as the "TRG incident" with each of them prior to the 7 July meeting and indeed had relied upon defendant Craven for advice in dealing with this episode. In 1980, three key employees had left plaintiff's company to form a competing company, selling the kind of systems they had learned to design while in plaintiff's employ. As a result, plaintiff lacked the manpower to fulfill existing orders and faced competition for new business. Plaintiff reacted by developing a new product line, which he licensed to Symex but which remained his property. Plaintiff also required his employees to sign non-competition and secrecy agreements to protect the value of his technology. Jones and Craven deny that either licensing or non-competition and secrecy agreements were even discussed at the 7 July meeting. Plaintiff insists that it was agreed that these protections would follow him from Symex to the new corporation and that defendant Craven was charged with getting the licensing agreement drafted, a licensing agreement which was to be a "carbon copy" of the agreement plaintiff had had with Symex. Viewing the evidence as required, the terms of the oral agreement were neither vague nor indefinite.

Defendants' argument as to vagueness and indefiniteness of the oral contract relies upon certain Court of Appeals cases where plaintiffs were nonsuited because of the imprecision of contract terms. They cite *Lamp Co. v. Capel,* 45 N.C. App. 105, 262 S.E. 2d 368, *cert. denied,* 300 N.C. 197, 269 S.E. 2d 617 (1980), in which the president of a defunct company who had written to a creditor of that company that he "would try to pay off" the company's debt, was held to have penned a letter too vague and

uncertain to support a contract action against him for the debt. Nonsuit also befell the buyer of certain trucks in *Industries, Inc. v. Cox,* 45 N.C. App. 595, 263 S.E. 2d 791 (1980), who alleged an oral contract to receive "patent rights" along with the trucks because the court found it impossible to say which among a large set of possible patent rights was being claimed. Similarly, in *Gregory v. Perdue, Inc.,* 47 N.C. App. 655, 267 S.E. 2d 584 (1980), the court held that a contract to raise chickens without specifying the quantity of birds could not be considered binding. Cases of this kind may be distinguished from the case before us. Here, the plaintiff presented evidence which demonstrates that the terms alleged by defendants to be indefinite were in fact sufficiently well delineated to all parties. Evidence which defined the terms in question was presented in this case, although contested by defendants.

Finally, we note that the failure of the parties to follow through with their intention to reduce the agreement struck on 7 July 1983 to writing does not prevent the underlying oral agreement from binding the parties. Where the evidence presented at trial is sufficient to support plaintiff's contention that a definite agreement was made by the parties, the contract is complete even though the parties contemplated reducing the agreement to writing. *Elks v. Insurance Co.,* 159 N.C. 619, 75 S.E. 808 (1912).

Plaintiff has offered sufficient evidence, when viewed most favorably to him, of each element of his claim so that reasonable men may form divergent opinions of its import. Therefore, the case was properly one for the twelve. *Smith v. McRary,* 306 N.C. 664, 295 S.E. 2d 444 (1982).

The decision of the Court of Appeals is reversed and the cause is remanded to that court for further remand to the Superior Court, Guilford County, for reinstatement of the jury verdict.

Reversed and remanded.