M. LEE HEATH, JR. v. CRAIGHILL, RENDLEMAN, INGLE & BLYTHE, P.A., JAMES B. CRAIGHILL, JOHN T. RENDLEMAN, JOHN R. INGLE AND ROBERT BLYTHE

No. 8926SC87

(Filed 6 February 1990)

1. **Attorneys at Law § 1 (NCI3d); Principal and Agent § 5.2 (NCI3d) — attorney's conversion of client's investment funds — liability of professional association — actual authority**

    A law firm was not liable for a former firm member's conversion of funds sent to him by plaintiff for investment on the ground that the former member's dealings with plaintiff were within the scope of authority conferred on him by the firm because plaintiff had given the firm a power of attorney "to deal generally and in all respects, without restriction, in and with any property of any nature whatsoever in which [plaintiff] may have any interest" where the law firm, an accounting firm and a bank were designated jointly as attorneys in fact and none could act without the concurrence of the other two, and where the former firm member did not employ the power of attorney in his dealings with plaintiff, signed promissory notes to plaintiff in his personal capacity, and wrote checks to plaintiff drawn on his personal account.

    **Am Jur 2d, Attorneys at Law §§ 216, 217.**

2. **Attorneys at Law § 1 (NCI3d); Principal and Agent § 5.2 (NCI3d) — attorney's conversion of client's investment funds — liability of professional association — apparent authority**

    A law firm was not liable for a former firm member's conversion of funds sent to him by plaintiff for investment on the ground that the former member acted within his apparent authority in soliciting funds from plaintiff where the evidence showed that a letter to plaintiff on firm stationery

HEATH v. CRAIGHILL, RENDLEMAN, INGLE & BLYTHE

[97 N.C. App. 236 (1990)]

was written entirely in the former member's hand; another letter to plaintiff was written on the former member's personal stationery; plaintiff was never billed by the firm for any aspect of his investments with the former member; neither plaintiff's testimony nor that of the former member's secretary supported plaintiff's claim that the other lawyers at the firm knew or should have known about the former member's solicitation and acceptance of money from plaintiff; the charter of the law firm, a professional association, limited it to rendering legal services; the former member was not the principal stockholder in the professional association and was not principally in charge of its operation; and the former member gave plaintiff no assurances that money invested with him would be handled through the law firm.

**Am Jur 2d, Attorneys at Law §§ 216, 217.**

3. **Attorneys at Law § 1 (NCI3d) — attorney's conversion of client's investment funds — liability of law firm — negligence and breach of fiduciary duty**

A law firm was not liable in damages for a former firm member's conversion of investment funds solicited by him from plaintiff on theories of negligence or breach of fiduciary duty since members of the firm had no duty to detect and supervise actions of a firm member which were outside the practice of law, which the member had no authority to take, and of which the other firm members had no reason to know.

**Am Jur 2d, Attorneys at Law §§ 216, 217.**

4. **Attorneys at Law § 1 (NCI3d); Trover and Conversion § 2 (NCI3d) — attorney's conversion of client's investment funds — Securities Act — no liability by professional association**

Members of a law firm were not liable for a former member's conversion of investment funds sent to him by plaintiff based on a violation of provisions of the N. C. Securities Act relating to civil liability for offering and selling securities by means of false or misleading statements, N.C.G.S. § 78-56(a), (c), where plaintiff failed to show that defendants knew or should have known that the former firm member was selling securities while he was a member of the firm, and defendants

thus did not "directly or indirectly control" the former firm member's actions within the meaning of the statute.

**Am Jur 2d, Attorneys at Law §§ 216, 217.**

APPEAL by plaintiff from Orders of *Judge James U. Downs* entered 13 May 1988 and 15 June 1988 in MECKLENBURG County Superior Court. Heard in the Court of Appeals 12 September 1989.

*Justice & Eve, P.A., by R. Michael Eve, Jr., for plaintiff appellant.*

*Smith Helms Mulliss & Moore, by E. Osborne Ayscue, Jr., and Benne C. Hutson, for defendant appellees.*

COZORT, Judge.

Plaintiff brought this action to recover damages from a law firm based on allegations that a former member of the law firm wrongfully converted investment funds given by plaintiff to the former member of the firm. The trial court granted the law firm's motion for directed verdict as to three of plaintiff's four theories of liability and granted the law firm's motion for judgment notwithstanding the verdict on the fourth. We affirm.

This lawsuit has its origins in the relationship between plaintiff M. Lee Heath, Jr., and Francis O. Clarkson, Jr., formerly a lawyer and member of Craighill, Rendleman, Clarkson, Ingle & Blythe, P.A. Clarkson had been a partner in the firm and became an officer, director, and employee when it incorporated as a professional association in July 1972. Beginning in 1977 Clarkson performed for Heath various legal services, including the preparation of a will, codicils, and a continuing power of attorney. Another member of the firm, Robert B. Blythe, handled real estate matters for Heath.

In September or October 1982, Clarkson telephoned to solicit Heath's investment "in some type of oil-related venture." When Heath returned the call, Clarkson told him that another investor had been found. In the winter and spring of 1983 Clarkson proposed two other investments to Heath. The first offer involved a client in need of operating funds who would pay Heath "five percent per month for thirty to ninety days" until a pending insurance settlement was approved. The second offer also involved a short-term loan, this time until funds were disbursed from an estate

in probate. Heath declined both offers because he did not have funds available.

In August 1983 Clarkson, promising a "two-to-one return," persuaded Heath to invest in an "Arab oil deal" with a "group of American investors" represented by Richard Seaman of Florida. Heath testified that when he asked about the risk, Clarkson replied: "I will minimize the risk by giving you my own promissory note." On 16 August 1983, in return for $25,000 Clarkson gave Heath a note for $50,000 payable on 30 September 1983. When the note came due, Clarkson promised an additional $12,500 in return for a two-week delay. Heath agreed to the new date and collected $62,500, representing a return on his money of one hundred and fifty percent in sixty days. In the meantime, in early October, by letter dated 30 September 1983, effective the same day, Clarkson resigned from his firm. The firm allowed him to remain in its offices for about two months until he negotiated a lease on an office condominium.

Heath's final investments with Clarkson were made in November 1983. Again Clarkson proposed investment in foreign oil exploration which would yield investors a one hundred percent return. On 4 November 1983, Heath gave Clarkson $50,000 and took a note for $100,000 payable 19 December 1983. At the same time Heath requested and received from Clarkson a letter which read: "This is to confirm that the funds to pay off my note of even date will come from a legitimate banking source and *not* from the sale of drugs, any criminal activity or a Communist Bloc Country." (Emphasis in original.) According to Heath, he wanted the letter because, "being a Federal Agent [employed by the United States Defense Investigative Service], it would not be wise for me not to have further documentation as to where I made money overseas."

Soon afterward Clarkson solicited a final $25,000 from Heath, who declined the invitation until promised a "three-to-one return on this last phase . . . ." On 19 November 1983 Heath exchanged $25,000 for Clarkson's note in the amount of $75,000 payable 19 December 1983 and a second letter from Clarkson stating "that the funds to pay off our loan of today will not come from any drug or criminal sources or any other illegal source."

Shortly after the notes came due, Clarkson wrote personal checks to pay them. His checks were dishonored. In February 1984, Clarkson paid Heath $50,000. Subsequently that payment was iden-

tified as a preference by Clarkson's trustee in bankruptcy, and $37,500 was reclaimed in the bankruptcy proceedings.

Plaintiff Heath initiated this action on 15 April 1986 with a complaint alleging that Clarkson converted plaintiff's funds and that defendants are liable for the conversion. Plaintiff made four claims, each of which set out a distinct theory for the recovery of damages: agency, breach of fiduciary duty, negligence, and violation of N.C. Gen. Stat. Chap. 78A (North Carolina Securities Act). Defendants denied liability, and the case came to trial before a jury.

On 13 May 1988, at the close of plaintiff's evidence, defendants moved for a directed verdict on all issues. The trial court granted that motion as to the second, third, and fourth claims and denied it as to the first (agency) claim. On the same day, at the close of all evidence, defendants renewed their motion for a directed verdict on the first claim. The court denied the motion, and the jury returned a verdict for the plaintiff in the amount of $25,000.

On 18 May 1988 defendants moved alternatively for judgment notwithstanding the verdict (JNOV) or for a new trial. On 15 June 1988 the trial court granted defendants' motion for JNOV and denied their alternative motion for a new trial. Plaintiff appealed from both the order of 13 May (directing a verdict for the defendants on the second, third, and fourth claims) and the order of 15 June (granting JNOV on the first claim). Defendants filed a cross-appeal from the court's denial of their motion for a new trial.

Plaintiff contends that the trial court erred in granting defendants' motion for JNOV on the first claim and in granting defendants' motion for a directed verdict on the second, third, and fourth claims. We disagree.

In ruling on a motion for JNOV or for a directed verdict, the same standard applies: "The judge must consider the evidence in the light most favorable to the nonmovant and may grant the motion only if, as a matter of law, the evidence is insufficient to justify a verdict for the nonmovant." *Williams v. Jones*, 322 N.C. 42, 48, 366 S.E.2d 433, 437 (1988); *see also Dickinson v. Pake*, 284 N.C. 576, 584-85, 201 S.E.2d 897, 902-03 (1974). When, as in the case below,

> a motion for a directed verdict made at the close of all the evidence is denied . . . the submission of the action to the jury *shall be deemed to be subject to a later determination*

*of the legal questions raised by the motion* . . . a party who
has moved for a directed verdict may move to have the verdict
and any judgment entered thereon set aside and to have judg-
ment entered in accordance with his [earlier] motion for a
directed verdict.

N.C. Gen. Stat. § 1A-1, Rule 50(b)(1) (1989) (emphasis added.) For
reasons of judicial economy, among others, a trial court may deny
a motion for a directed verdict and then grant a motion for JNOV.
Unlike an erroneous JNOV, if a directed verdict is in error, judg-
ment cannot be entered for the nonmovant; instead, upon determin-
ing that the issue should have gone to the jury, the appellate
court must require a new trial.

A professional corporation like the firm in the case below
is liable on the same basis and to the same extent as a partnership.
*Zimmerman v. Hogg & Allen*, 22 N.C. App. 544, 546, 207 S.E.2d
267, 269, *rev'd on other grounds*, 286 N.C. 24, 209 S.E.2d 795 (1974).
A partnership is liable for loss or injury caused "by any wrongful
act or omission of any partner *acting in the ordinary course of
business of the partnership or with the authority of his copartners*
. . . to the same extent as the partner so acting or omitting to
act." N.C. Gen. Stat. § 59-43 (1989) (emphasis added). Thus, the
question presented upon the trial court's grant of JNOV turns
on whether, as a matter of law, there was insufficient evidence
to justify a verdict that Clarkson's dealings with Heath were within
the scope of authority or apparent authority conferred on Clarkson
by his firm.

[1]   Authority, sometimes called actual authority, "is the power
of the agent to affect the legal relations of the principal by acts
done in accordance with the principal's manifestations of consent
to him." Restatement (Second) of Agency § 7 (1958). Plaintiff con-
tends that Clarkson had authority from his firm to solicit money
from Heath for investment. Plaintiff bases that contention on the
power of attorney which empowered Craighill, Rendleman, Clarkson,
Ingle & Blythe, P.A. "to deal generally and in all respects, without
restriction, in and with any property of any nature whatsoever
in which [Heath] may have any interest."

Plaintiff's argument, however, ignores crucial facts. First,
Clarkson's firm, Arthur Young & Co., and City National Bank were
designated jointly as attorneys in fact. None could act without
the concurrence of the other two. Secondly, when Clarkson took

money from Heath, he dealt face to face. Clarkson did not employ or attempt to employ the power of attorney in his transactions with Heath. The promissory notes Heath received were signed by Clarkson in his personal capacity, and the checks he wrote to Heath were drawn on Clarkson's personal account. Without more, the fact that Clarkson's firm was designated in a power of attorney did not confer on Clarkson the authority to deal as he did with Heath.

[2] Apparent authority "is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses." *Zimmerman v. Hogg & Allen*, 286 N.C. at 31, 209 S.E.2d at 799. Under the doctrine of apparent authority, a "principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent." *Id.* Plaintiff contends that, even if Clarkson lacked authority for his dealings with Heath, he acted under the aegis of apparent authority.

Plaintiff submits that apparent authority to solicit money may be attributed to Clarkson from a variety of transactions and circumstances. Plaintiff alleges principally that Clarkson's letter of 4 November 1983 was written on firm stationery, and he asserts that "[o]n one occasion, James Craighill, a partner [sic] in the firm, was present with two staff members and overheard a discussion between Clarkson and Heath concerning the transactions."

Plaintiff fails to note that he was never billed by the firm for any aspect of his investments with Clarkson, including the letters of 4 November and 19 November 1988, which plaintiff characterizes as "legal opinions." The letter of 19 November was written on Clarkson's personal stationery. James Craighill testified that on or about 30 September 1983 the firm instructed its "secretaries [to] run a line through [Clarkson's] name to indicate that he was no longer with the firm . . . ." Clarkson's letter of 4 November 1983 on firm stationery was not typed by a secretary; it was written entirely in his hand.

Regarding the discussion between Clarkson and plaintiff, at which James Craighill, Janice Burton and Elizabeth Carr were present, plaintiff testified as follows:

I made what you would call, I guess, a jestful comment, in the presence of all these people, and I said, "I'd better be

**HEATH v. CRAIGHILL, RENDLEMAN, INGLE & BLYTHE**

[97 N.C. App. 236 (1990)]

careful. Frank will have me signing over all my assets to him so he can invest it with his Arab clients," to which Mr. Clarkson responded, "Yes. They're having cash flow problems in Jidda,["] to which I responded, "Yes. Those poor Arabs are only making millions instead of billions." . . . . Everybody heard it. Everybody laughed. Mr. Clarkson chuckled, and Mr. Craighill grinned, and the girls sort of grinned, too, knowing that basically my comment was a jestful comment.

Ms. Burton testified that secretaries "were allowed to do personal work for the attorneys whose legal work they did." She testified further that, to the extent she knew of Clarkson's meetings with Heath, she never discussed them with other lawyers in the firm. Neither plaintiff's testimony, nor that of Ms. Burton supports his claim that other lawyers at the firm knew or "*should have known* about Clarkson's soliciting and accepting the money." (Emphasis in original.)

Finally, plaintiff cites *Zimmerman v. Hogg & Allen* in support of his argument for reinstating the verdict below. In *Zimmerman* our Supreme Court refused to allow summary judgment against a plaintiff who sought to hold a professional association liable for the stock transactions of one of its agents (Glenn L. Greene, Jr.) with the plaintiff. In its holding, the Court relied on the following facts:

[T]he powers granted to the Professional Association by its charter were very broad powers, the exercise of which was principally in the hands of Greene; that defendant Greene, while he was on business trips to attend to the legal business of Holly Farms, accepted funds for investment purposes from employees of the corporate client; that these corporate employees were assured that such moneys would be handled through the Professional Association; that such activities by Greene, the president and principal stockholder of the Professional Association, had occurred over a period of several years; and that [shareholder-]employees of the Professional Association had knowledge of such dealings.

*Zimmerman v. Hogg & Allen*, 286 N.C. at 39, 209 S.E.2d at 804.

In the case below, the charter of Craighill, Rendleman, Clarkson, Ingle & Blythe, P.A., limited it to rendering legal services. Clarkson was not the principal stockholder of the professional association,

nor principally in charge of its operation. He gave no assurances that money invested with him would be handled through his law firm, and plaintiff presented no credible evidence that other shareholder-employees knew or had reason to know of Clarkson's transactions with Heath. Given these facts, plaintiff's reliance on *Zimmerman* is misplaced.

[3]   We turn now to plaintiff's contention that the trial court erred in directing a verdict for defendants on the claims of breach of fidiciary duty, negligence, and violation of the North Carolina Securities Act. These claims (the second, third, and fourth in the pleadings) are grounded on the same facts presented in the first claim, and those facts are inadequate to support elements essential for plaintiff's recovery of damages.

Breach of fiduciary duty is a species of negligence or professional malpractice. *Childers v. Hayes*, 77 N.C. App. 792, 795, 336 S.E.2d 146, 148 (1985), *disc. review denied*, 316 N.C. 375, 342 S.E.2d 892 (1986). For recovery in any type of negligence action there must exist a duty owed by the defendant to the plaintiff. In the case below, as in the parallel case of *McGarity v. Craighill, Rendleman, Ingle & Blythe, P.A.*, plaintiff "would have to show that defendants owed a duty to detect and supervise Mr. Clarkson's activities which were outside the practice of law, which he had no authority to take, and of which defendants had no reason to know." *McGarity*, 83 N.C. App. 106, 111, 349 S.E.2d 311, 314 (1986), *disc. review denied*, 319 N.C. 105, 353 S.E.2d 112 (1987). As a matter of law, no such duty exists. *Id.*

[4]   Plaintiff bases his final theory of defendants' liability on N.C. Gen. Stat. § 78A-56(a) and (c). Subsection (a) defines the civil liability of a person offering and selling securities by means of false or misleading statements. Subsection (c) reads, in pertinent part,

> Every person who directly or indirectly controls a person liable under subsection (a) or (b), every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the act or transaction, and every dealer or salesman who materially aids in the sale are also liable jointly and severally with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and did not act in reckless

disregard, of the existence of the facts by reason of which the liability is alleged to exist.

Because plaintiff failed to show that the defendants knew or should have known that Clarkson was selling securities they cannot be held to have "directly or indirectly control[led]" his actions within the meaning of the statute.

We hold that the trial court ruled correctly on the defendants' motions for directed verdict and JNOV. Our holding renders moot the defendants' cross-appeal pursuant to N.C. Gen. Stat. § 1A-1, Rule 50(c).

The trial court's orders of 13 May 1988 and 15 June 1988 are

Affirmed.

Judges ARNOLD and BECTON concur.