MICRO CAPITAL INVESTORS, INC. v. BROYHILL FURN. INDUS., INC.

[221 N.C. App. 94 (2012)]

exercise of jurisdiction would not have comported with traditional notions of fair play and substantial justice.

AFFIRMED.

Judges CALABRIA and ERVIN concur.

———

MICRO CAPITAL INVESTORS, INC., Plaintiff v. BROYHILL FURNITURE
INDUSTRIES, INC., Defendant

No. COA11-982

(Filed 5 June 2012)

### 1. Jurisdiction—breach of contract—standing—implied stipulation—contract applied to plaintiff

Plaintiff had standing to bring a lawsuit against defendant for breach of contract where the parties apparently agreed that Section 10 of the contract applied to plaintiff and defendant rather than a third party (Whittier) and defendant, defendant appeared not to have ever raised the issue of standing and itself expressly read "Buyer" as "Plaintiff" in its summary judgment brief, and the Court of Appeals treated this as an implied stipulation between the parties to substitute plaintiff for Whittier in Section 10.

### 2. Contracts—breach of Contract— essential term vague—no meeting of minds

The trial court did not err in a breach of contract case by entering summary judgment in favor of defendant. Section 10 of the contract was not enforceable because, under the circumstances of this case, the term "total heating bill" was too indefinite, demonstrating that there was no meeting of the minds as to that essential term.

### 3. Pretrial proceedings—motion to amend denied—undue delay

The trial court did not err in a breach of contract case by denying plaintiff's motion for leave to amend its complaint to include a claim for *quantum meruit*. Plaintiff could have argued *quantum meruit* in the alternative before defendant moved for summary judgment and plaintiff's only reason for moving to amend more

than eleven months after filing its complaint and three months after amending its complaint a first time was that the motion was a response to defendant's summary judgment motion.

Appeal by plaintiff from orders entered 28 January 2011 and 1 February 2011 by Judge Edgar B. Gregory and order entered 24 January 2011 by Judge Yvonne Mims Evans in Caldwell County Superior Court. Heard in the Court of Appeals 25 January 2012.

*James, McElroy & Diehl, P.A., by John Parke Davis and Preston O. Odom III, for plaintiff.*

*Kilpatrick Townsend & Stockton LLP, by Susan H. Boyles and Dustin T. Greene, for defendant.*

ELMORE, Judge.

Micro Capital Investors, Inc. (plaintiff), appeals from an order entering summary judgment in favor of Broyhill Furniture Industries, Inc. (defendant), and an order denying plaintiff's motion for leave to amend its complaint. After careful consideration, we affirm the orders of the trial court.

## I. Background

This case revolves around a furniture manufacturing plant and warehouse in Lenoir. The plant, known as the Harper Plant, occupies approximately 333,677 square feet. The warehouse, known as the Harper Warehouse, shares a wall with the Harper Plant but is much smaller, occupying approximately 80,000 square feet. In addition to a wall, the Plant and Warehouse share a heating system, which is at the center of this dispute. Two wood-burning boilers generated heat for both the Plant and the Warehouse using wood waste, a byproduct of the furniture manufacturing process. The boilers are located in the Plant and send steam to pipes and radiators in the Warehouse. They also provide the steam energy needed to operate the equipment used to manufacture furniture in the Plant.

In 2005, The Woodsmiths Company (Woodsmiths) sought to buy the Harper Plant from defendant after a hurricane destroyed its primary manufacturing facility in Florida. However, Woodsmiths could not obtain financing for the purchase, so it arranged for another company, The Whittier Group, Inc. (Whittier), to purchase the plant and manufacturing equipment and then lease them to Woodsmiths. Whittier and defendant agreed on the terms of purchase and executed

an Agreement of Sale (Agreement) on 31 October 2005; however, the deal fell through because the parties could not agree on how to split the cost of heating the Plant and the Warehouse, which would remain occupied by defendant and was not part of the transaction.

The parties continued to negotiate, and Woodsmiths brought in a second investor, plaintiff, at Whittier's insistence. On 8 November 2005, plaintiff, defendant, and Whittier executed an Amendment to Agreement of Sale (Amendment), which amended the Agreement to provide that Whittier would purchase the Plant's machinery and equipment and plaintiff would purchase the Plant's real property. The Amendment replaced the "Purchase Price" section of the Agreement with new language, which eliminated a financing provision and required the full purchase price to be paid by check at the closing. The Amendment also included these provisions:

> 3. Continuing Effect. Except as expressly modified by the terms and provisions of this Amendment, each and every term and provision of the Agreement is unchanged and shall continue in full force and effect.

> * * *

> 6. Terms. Except as otherwise set forth herein, all capitalized terms utilized in this Amendment shall have the meaning ascribed to those same terms in the Agreement.

After the Amendment was executed and the sale completed, plaintiff entered into a lease with Woodsmiths for the use of the Plant. Under the lease, Woodsmiths agreed to pay for all utilities, including heat. Woodsmiths also entered into a lease with Whittier for the use of the Plant equipment. Although the lease agreement itself is not in the appellate record, paid invoices show that Woodsmiths paid Whittier $40,000.00 per month for use of the equipment. Defendant continued to occupy the Warehouse.

The Agreement included a number of exhibits and schedules, including Exhibit D, the post-closing schedule. According to section 2 of the Agreement, "Machinery and Equipment Sold and Purchased," Exhibit D dictated that defendant remove the machinery and equipment listed in Exhibit C "prior to Closing or after Closing according to" the post-closing schedule, which was attached and incorporated by reference. Exhibit D included the following two sections, which address the heating system:

9. Seller shall assist Buyer in determining the best course of action to heat the Premises over the winter. Should Buyer and Seller agree that converting one or both boilers to natural gas capable is most advantageous, Seller shall assist Buyer in retrofitting a natural gas fired burner to one or both boilers in the Premises. If another solution is selected, Seller will assist Buyer in purchasing and installing such a solution. Notwithstanding anything contained herein to the contrary, Seller shall not be obligated to pay any part of the expense incurred to purchase, install, retrofit or modify any equipment or facilities under this paragraph.

10. The Leased Warehouse does not contain its own heating system and will need to be serviced by whatever heating system is decided upon for the Premises. Buyer shall supply sufficient heat from the heating system in the Premises to adequately heat the Leased Warehouse from the date of Closing to the date Seller no longer continues to rent the Leased Warehouse. Buyer may charge Seller for one-fourth (1/4th) of the total heating bill for the Premises and the Leased Warehouse, subject to adjustment in the event either party's operations require more heat than currently anticipated. Buyer agrees to sign such further documents as Seller requires at Closing to evidence the agreement in this paragraph.

Despite the language in section 10 of Exhibit D (Section 10), defendant was not charged for heating the Warehouse until 25 February 2009, when Woodsmiths sent a letter to defendant seeking $384,342.00 to compensate Woodsmiths for ¼ of the heating expenses generated during the previous four winters (a total of $1,537,369.00). The letter, written by Michael Munoz, included the following relevant language:

In November 2005 I purchased from Broyhill Furniture Industries Inc. the Harper plant located at 418 NW Prospect St., Lenoir, NC. As part of that purchase, my company was required to provide heat to the co-located warehouse for the duration of Broyhill's lease of that facility. I have been providing heat over the last 4 seasons per Exhibit D, Section 10. Section 10 allows me to charge Broyhill 25% of my heating costs. I have never invoiced Broyhill for these costs and I wish to do so now.

Defendant paid $50,000.00 in response to this demand and offered to pay additional funds for heat when it received proof that heat was actually supplied to the Warehouse. On 31 October 2009, Munoz sent

a second letter to defendant with an updated cost breakdown show-
ing that defendant's share of Woodsmiths's heating expense was now
$459,968.00. Defendant refused to pay because it was never provided
with sufficient documentation to support Woodsmiths's contention
that heat was supplied to the Warehouse or the costs associated with
generating that heat.

Plaintiff then brought this lawsuit on 30 December 2009, suing
defendant for breach of contract. Plaintiff's claim hinges on Section
10, which it claims requires defendant to "be responsible" for ¼ of the
"total heating bill" for the Plant and Warehouse. In its complaint,
plaintiff alleged that it had supplied heat to the Warehouse since
November 2005 and had invoiced defendant for $474,302.00, although
it did not include that invoice with the complaint or within the appel-
late record.

On 29 November 2010, defendant moved for summary judgment,
arguing that the agreement was unenforceable because the term "total
heating bill" was ambiguous and the parties had never reached an
agreement about what elements would properly comprise the "total
heating bill." A hearing before Judge Edgar B. Gregory was set for 9:00
a.m. on Monday, 13 December 2010, to hear defendant's motion. At
4:31 p.m. on Friday, 10 December 2010, plaintiff filed a motion for
leave to amend its complaint pursuant to Rule 15 to include a claim for
*quantum meruit.* On 17 December 2010, following the summary judg-
ment hearing, Judge Gregory sent an email to the parties stating that
he had drafted an order granting defendant's order of summary judg-
ment but that he would wait to sign the order until after a ruling on the
pending motion to amend. Judge Yvonne Mims Evans heard the
motion to amend on 18 January 2011 and entered an order denying it
on 24 January 2011. Judge Gregory then entered the summary judg-
ment order on 28 January 2004, followed by an amendment correcting
the names of the attorneys, entered on 1 February 2011.

Plaintiff appeals from both the summary judgment order and the
order denying its motion for leave to amend. We affirm both orders.

## II. Arguments

### A. Standing

[1] Though not addressed in the parties' briefs, this Court first
addresses the issue of standing. The express language of the disputed
language in Section 10, which recites the obligations of "Buyer" and
"Seller," states that *Whittier* has the right to collect ¼ of the "total

MICRO CAPITAL INVESTORS, INC. v. BROYHILL FURN. INDUS., INC.

[221 N.C. App. 94 (2012)]

heating bill" from defendant, *not plaintiff* or Woodsmiths. The Agreement defines "Buyer" as Whittier; it defines plaintiff as "Micro Capital" and uses "Buyer" and "Micro Capital" throughout the document and on the signature blocks, supporting the conclusion that the obligations of Whittier and plaintiff under the contract were not interchangeable. In addition, Exhibit D arises under the machinery and equipment section of the Agreement, which would apply to Whittier, which purchased the machinery and equipment, rather than plaintiff, which purchased the real property. Woodsmiths was not a party to the contract at all. The record does not include any express agreement between Whittier and plaintiff transferring to plaintiff Whittier's right to collect ¼ of the "total heating bill" from defendant. Thus it is not clear to this Court why plaintiff brought this suit rather than Whittier. Nevertheless, the parties seem to have agreed that Section 10 applies to plaintiff and defendant rather than Whittier and defendant. Defendant appears not to have ever raised the issue and itself expressly read "Buyer" as "Plaintiff" in its summary judgment brief. Accordingly, we treat this as an implied stipulation between the parties to substitute plaintiff for Whittier in paragraph 10 of Exhibit D.[1] *See Accelerated Framing, Inc. v. Eagle Ridge Builders, Inc.,* \_\_\_\_ N.C. App. \_\_\_\_, \_\_\_\_, 701 S.E.2d 280, 283 (2010) (holding that parties can stipulate that they were both parties to a contract and thus the real parties in interest, even when one party did not sign the contract).

**B. Summary Judgment**

**[2]** We next address whether the trial court erred by granting defendant's motion for summary judgment and hold that it did not.

> The party moving for summary judgment is entitled to judgment as a matter of law only when there is no genuine issue of material fact. The party moving for summary judgment bears the burden of bringing forth a forecast of evidence which tends to establish that there is no triable issue of material fact. To overcome a motion for summary judgment, the nonmoving party must then produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a *prima facie* case at trial.

---

1. Confusion may have arisen because Mark Munoz is an officer of plaintiff Micro Capital, Whittier, and Woodsmiths. He is also an officer of the company that owns the Warehouse, Mark Munoz LLC. According to his deposition testimony, these companies are all independent and have no corporate relationship to one another. At times, as demonstrated by the heating invoices sent to defendant, Munoz conflated his distinct roles in these companies.

Before summary judgment may be entered, it must be clearly established by the record before the trial court that there is a lack of any triable issue of fact. In making this determination, the evidence forecast by the party against whom summary judgment is contemplated is to be indulgently regarded, while that of the party to benefit from summary judgment must be carefully scrutinized. Further, any doubt as to the existence of an issue of triable fact must be resolved in favor of the party against whom summary judgment is contemplated.

*Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998) (quotations and citations omitted; alteration in original). We review an order of summary judgment *de novo. Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007).

Plaintiff argues that defendant's obligation under Section 10 is enforceable, while defendant counters that Section 10 is not enforceable because the term "total heating bill" is too indefinite, demonstrating that there was no meeting of the minds as to that essential term. We agree with defendant.

There is no contract unless the parties assent to the same thing in the same sense. A contract is the agreement of two minds—the coming together of two minds on a thing done or to be done. A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree.

*Williams v. Jones*, 322 N.C. 42, 49, 366 S.E.2d 433, 438 (1988) (quotations and citation omitted). "[I]n order to constitute a valid and enforceable contract there must be an agreement of the parties upon the essential terms of the contract, definite within themselves or capable of being made definite." *Brawley v. Brawley*, 87 N.C. App. 545, 549, 361 S.E.2d 759, 762 (1987) (citation omitted). "[A] contract will not be held unenforceable because of uncertainty if the intent of the parties can be determined from the language used, construed with reference to the circumstances surrounding the making of the contract, and its terms reduced to a reasonable certainty." *Id.* (citations omitted).

Under other circumstances, the term "total heating bill" might be definite, but under these circumstances, it was not. Because of the unusual heating system—wood-burning boilers that run on wood waste, a byproduct of the manufacturing process that takes place

within the Plant, which also power the manufacturing equipment—there was no "heating bill" from a third party like the power company. Instead, Woodsmiths generated invoices that were broken down into the following components: direct consumable expense, utilities, boiler dust machinery rents/leases, labor, and fire and boiler insurance. A former Broyhill employee stated that he was surprised by these charges and, in his view, "the only charges that should be on a heating bill for the property would be fuel, boiler operator wages, and a nominal fee for utilities." It is clear from the record that, before the Amendment was executed, the parties discussed at length how the properties were heated and whether plaintiff should install a different heating system, given the general decline in furniture manufacturing and thus an associated decline in the availability of wood waste. However, from both Munoz's testimony and the affidavits submitted by defendant's employees, the parties never agreed what components would constitute a "total heating bill" and, thus, the term was too indefinite to be enforceable. Accordingly, we affirm the order of the superior court granting defendant's motion for summary judgment.

## C. Motion to Amend

[3] Plaintiff next argues that the trial court abused its discretion by denying its motion to amend its complaint. We disagree.

Motions to amend are governed by North Carolina Civil Procedure Rule 15(a), which provides, in relevant part, that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." N.C. Gen. Stat. § 1A-1, Rule 15(a) (2011).

A ruling on a motion for leave to amend is addressed to the sound discretion of the trial judge and the denial of such a motion is not reviewable absent a clear showing of abuse of discretion.

A trial court abuses its discretion only where no reason for the ruling is apparent from the record. Our Courts have held that reasons justifying denial of leave to amend are undue delay, bad faith, undue prejudice, and futility of amendment.

*Rabon v. Hopkins*, ____ N.C. App. ____, ____, 703 S.E.2d 181, 184 (2010) (quotations and citations omitted), *disc. review denied*, 365 N.C. 195, 710 S.E.2d 22 (2011).

Here, as in *Rabon*, it appears that the trial court based its decision on undue delay.

This Court has held that a trial court may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay. *See Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 447-48, 197 N.C. App. 433, 678 S.E.2d 671, 681 (2009) (affirming denial of leave to amend where defendant filed motion three months after filing answer and offered no credible explanation for the delay); *Walker v. Sloan*, 137 N.C. App. 387, 402, 529 S.E.2d 236, 247 (2000) (affirming denial where there was nothing in the record to explain why plaintiff waited until three months after defendant filed answer); *Caldwell's Well Drilling, Inc. v. Moore*, 79 N.C. App. 730, 731, 340 S.E.2d 518, 519 (1986) (affirming denial of leave to amend where record did not indicate why plaintiff waited three months from filing of answer before moving to amend complaint).

*Id.* at _____, 703 S.E.2d at 184. In *Rabon*, we affirmed a trial court's denial of a motion to amend when the plaintiff moved to amend the complaint nine months after filing it without providing a sufficient explanation for the delay. *Id.* at _____, 703 S.E.2d at 185.

Here, plaintiff moved to amend more than eleven months after filing its complaint and three months after amending its complaint a first time to increase the damages sought. The substance of the second amendment was to add a claim for *quantum meruit*, a claim that could have been argued in the alternative in the original complaint or in the first amended complaint based on the information known to plaintiff at the time. At the motion hearing, the only explanation offered by plaintiff for the delay was that the motion was a response to defendant's summary judgment motion; plaintiff wanted to present an alternative theory of recovery "in case summary judgment was granted in favor of the defendant." However, plaintiff could have argued *quantum meruit* in the alternative before defendant moved for summary judgment, and plaintiff did not offer any explanation for its failure to do so. Accordingly, we cannot conclude that the trial court abused its discretion by denying the motion.

Moreover, we note that plaintiff filed its motion to amend at 4:31 p.m. on the Friday before the summary judgment hearing, which was scheduled for 9:00 a.m. the following Monday. This Court has previously affirmed an order denying a motion to amend that was brought the same day that a summary judgment ruling was delivered "in order

to avoid a possible adverse summary judgment ruling," explaining that the timing supported a finding of undue delay. *Williams v. Craft Dev., LLC*, 199 N.C. App. 500, 510, 682 S.E.2d 719, 726 (2009) (internal quotation marks omitted). We also held that filing the motion to amend in order to avoid an adverse summary judgment ruling also supported findings of "bad faith" and "undue prejudice." *Id.* Although plaintiff filed its motion on the eve of the summary judgment hearing rather than on the day that the ruling came down, the timing still supports our conclusion that the trial court did not abuse its discretion by denying plaintiff's motion.

### III. Conclusion

Accordingly, we affirm both the summary judgment orders and the order denying plaintiff's motion to amend.

Affirmed.

Judge BRYANT concurs.

Judge ERVIN concurs in part and dissents in part per separate opinion.

ERVIN, Judge, concurring in part and dissenting in part.

Although I concur in the Court's treatment of the issue of standing and the Court's decision to affirm Judge Evans' denial of Plaintiff's motion to amend its complaint, I am unable to concur in its decision to affirm Judge Gregory's decision to grant summary judgment in favor of Plaintiff. As a result, I concur in the Court's decision in part and dissent from that decision in part.

As the Court notes, the extent to which Judge Gregory's orders granting summary judgment in favor of Defendant should or should not be affirmed hinges upon whether the contractual provision requiring Defendant to pay for heat supplied to the warehouse in the amount of "one-fourth (1/4th) of the total heating bill for the Premises and the Leased Warehouse, subject to adjustment in the event either party's operations require more heat than currently anticipated," is so vague as to be unenforceable. Although well-established North Carolina law clearly provides that "the terms of a contract must be sufficiently definite that a court can enforce them," *Wein II, LLC v. Porter*, 198 N.C. App. 472, 480, 683 S.E.2d 707, 713 (2009) (citation omitted), and that, since "price or compensation is an essential ingre-

dient of every contract," the price to be paid for a service provided pursuant to a contract "must be definite and certain or capable of being ascertained from the contract itself," *Howell v. Allen & Co.,* 8 N.C. App. 287, 289, 174 S.E.2d 55, 56 (1970), "[w]here the parties have attempted to put in writing an agreement fixing the rights and duties owing to each other, courts will not deny relief because of vagueness and uncertainty in the language used, if the intent of the parties can be ascertained." *Goodyear v. Goodyear,* 257 N.C. 374, 379, 126 S.E.2d 113, 117 (1962). For that reason, since "[t]he law . . . does not favor the destruction of contracts on account of uncertainty," "courts should attempt to determine the intent of the parties from the language used, construed with reference to the circumstances surrounding the making of the contract." *Welsh v. Northern Telecom, Inc.,* 85 N.C. App. 281, 290, 354 S.E2.d 746, 751 (citing *Fisher v. Lumber Co.,* 183 N.C. 486, 490, 111 S.E. 857, 860 (1922), and *Chew v. Leonard,* 228 N.C. 181, 185, 44 S.E.2d 869, 872 (1947)), *disc. review denied,* 320 N.C. 638, 360 S.E.2d 107 (1987).

As I read the relevant contractual language, the parties clearly agreed that Plaintiff was obligated to provide adequate heat to the warehouse from the facilities that provided heat to the entire premises and that Defendant would pay one quarter of the "total heating bill" in return for the provision of that service. I also conclude that the expression "total heating bill," when read in light of the fact that there was no third party supply of heat to the premises, clearly makes reference to the cost incurred in providing the needed heat. At an absolute minimum, this understanding of the parties' contract is a reasonable construction of the relevant contractual language which the jury should be allowed to consider in the course of deciding this case. *Williams v. Jones,* 322 NC. 42, 52, 366 S.E.2d 433, 440 (1988) (holding, where "the plaintiff presented evidence which demonstrates that the terms alleged by the defendants to be indefinite were in fact sufficiently well delineated to all parties," the entry of judgment notwithstanding the verdict in favor of the defendants was inappropriate despite the fact that the defendants contested the plaintiff's evidence concerning the manner in which the relevant contractual language should be construed). Unlike the situation in *Connor v. Harless,* 176 N.C. App. 402, 406, 626 S.E.2d 755, 758 (2006), *disc. review denied,* 361 N.C. 219, 642 S.E.2d 247 (2007), the agreement at issue here provides for a single standard for use in determining the price to be charged for the provision of heat rather than contemplating the use of multiple appraisals without specifying any means for reconciling the inevitable differences between the opinions devel-

oped by multiple appraisers. In addition, unlike the situation in *Chappell v. Roth*, 353 N.C. 690, 693, 548 S.E.2d 499, 500 (2001) (holding that a settlement agreement in which the parties failed to agree upon the terms of a release was unenforceable), and *Rosen v. Rosen*, 105 N.C. App. 326, 328, 413 S.E.2d 6, 8 (1992) (holding that a parent's agreement to "assist" his children in obtaining a college education was unenforceable given the absence of any standard by which an appropriate level of assistance could be determined), the parties did actually reach a complete agreement which specified the nature of the service to be provided and a single standard for use in determining the price to be paid for that service. Thus, the agreement between the parties can reasonably be construed to mean that the price to be paid for the heat supplied to the warehouse would be one-fourth of the cost incurred in connection with the provision of heat to the entire premises. As a result, the ultimate question before the Court is whether a provision requiring Defendant to pay one-fourth of the cost of providing heat to the premises is so vague as to be unenforceable. I do not believe that it is.

The "cost" of providing a particular service is, in essence, "an amount that has to be paid or spent to buy or obtain something." *New Oxford English Dictionary* 392 (3d ed. 2010). For that reason, I believe that the relevant contractual language requires Defendant to pay one-fourth of the amount that Plaintiff had to spend in order to provide heat to the premises in return for the provision of heat to the warehouse. Although the exact cost of heating the premises is not set out in the agreement, I believe that the cost of providing that service can, in fact, be calculated, with the cost incurred in heating the premises being nothing more than a question of fact that should be resolved by the trier of fact following the presentation of the parties' evidence. As a result, I do not believe that the price term at issue here is so vague as to be unenforceable and disagree with the Court's conclusion to the contrary.[1]

The other arguments advanced in support of the result reached by the Court do not strike me as persuasive. The fact that the parties may not have discussed the specific components of the required cost determination in detail at the time that they executed the contract and now disagree over how the relevant cost should be calculated does not, in my view, suffice to show that the price term at issue here

---

1. The problems inherent in the result reached by the Court should be apparent when one considers how frequently cost-plus contracts that lack an exact formula for making the necessary cost calculation are encountered in the North Carolina economy.

is so vague as to be unenforceable given that the applicable standard is a relatively clear one and given that the relevant amount can be calculated using the applicable standard. Similarly, the fact that the parties appear to have contemplated a possible change in the manner in which the premises were to be heated does not mean that there was no "total heating bill" associated with the operation of whatever facilities were actually used to provide needed heat. Furthermore, the fact that "Buyer agrees to sign such further documents as Seller requires at Closing to evidence the agreement in this paragraph" does not establish that the price term is unenforceable given that the standard set out in the contract is, in my view, sufficiently clear and given that there is no evidence that Defendant ever requested that additional documents be executed at or before the time that the underlying transaction closed. Although Defendant contends that the relevant contractual language is nothing more than an unenforceable agreement to agree, *Northington v. Michelotti*, 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995) (stating that "a so-called 'contract to make a contract' is not a contract at all"), the language in question clearly requires Plaintiff to provide adequate heat to Defendant and requires Defendant to pay one quarter of the cost of heating the premises in return for the provision of that service. The fact that the parties agreed to make an "adjustment in the event either party's operations require more heat than currently anticipated" does not strike me as relevant given the absence of any indication that either party ever requested that an adjustment of the type contemplated by this language be made. In addition, the fact that heat was provided to the premises using a system that served a number of different purposes, while perhaps adding an additional layer of complexity to the cost calculation, does not suffice to render the relevant price term unenforceable given the finder of fact's ability to make appropriate cost allocations. Finally, the fact that Plaintiff's calculation of the cost of providing heat to the premises has "evolved" and includes, at least in my opinion, certain costs that are not encompassed within the price term set out in the contract does not render the price term unenforceable given the parties' ability to present evidence concerning what is and is not a proper component of the cost of providing heat and the ability of the trier of fact to determine what is and is not a proper component of the cost of heating the premises. Thus, none of the arguments advanced in support of the result reached by the Court strike me as persuasive.

Thus, I believe that the record evidence, when taken in the light most favorable to Plaintiff, would support a determination that the relevant contractual language should be construed so as to require Defendant to pay one-fourth of the cost of heating the premises in return for the provision of heat to the warehouse and that the calculation of this figure is a question of fact to be determined by the trier of fact. For that reason, I am unable to join the Court's conclusion that the price term associated with the heating service that Plaintiff was required to provide to Defendant is so vague as to be unenforceable as a matter of law. As a result, I respectfully dissent from the Court's decision to affirm Judge Gregory's decision to grant summary judgment in favor of Defendant and would, instead, reverse Judge Gregory's decision to grant summary judgment in favor of Defendant and remand this case to the Caldwell County Superior Court for further proceedings. I do, however, concur in the remainder of the Court's opinion.