Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP, 2018 NCBC 16.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

ZLOOP, INC.,

        Plaintiff,

    v.

PARKER POE ADAMS & BERNSTEIN, LLP; ALBA-JUSTINA SECRIST a/k/a A-J SECRIST; and R. DOUGLAS HARMON,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 5480

**ORDER & OPINION ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO N.C.R.C.P. 12(c)**

1. THIS MATTER is before the Court on Defendants Parker Poe Adams & Bernstein, LLP, Alba-Justina Secrist, and R. Douglas Harmon's Motion for Judgment on the Pleadings Pursuant to N.C.R.C.P. 12(c) ("Motion"). For the reasons discussed below, the Court GRANTS the Motion.

> *Rossabi Reardon Klein Spivey PLLC, by Gavin J. Reardon and Amiel J. Rossabi, and Allen & Gooch, by James H. Gibson (pro hac vice) and Charles M. Kreamer (pro hac vice), for Plaintiff Zloop, Inc.*
>
> *Robinson, Bradshaw & Hinson, P.A., by Robert W. Fuller and Stuart L. Pratt, for Defendants Parker Poe Adams & Bernstein, LLP, Alba-Justina Secrist a/k/a A-J Secrist, and R. Douglas Harmon.*

Gale, Chief Judge.

## I. INTRODUCTION

2. This case "raises thorny questions relating to the bounds of legitimate legal advocacy and transgressive participation by attorneys at law in a client's illegal

conduct." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 407 (3d Cir. 2003).

3.      Plaintiff Zloop, Inc. ("Zloop") is a bankrupt electronic-waste-recycling corporation in the process of liquidation that was formerly managed or owned by Robert Boston ("Boston") and Robert LaBarge ("LaBarge"), each of whom allegedly looted Zloop for personal benefit.  Defendants are the law firm Parker Poe Adams & Bernstein, LLP ("Parker Poe") and two of its present or former attorneys Alba-Justina Secrist ("Secrist") and R. Douglas Harmon ("Harmon") (collectively, "Defendants"). In this action, Zloop seeks to recover damages based on claims for: (1) legal malpractice; (2) breach of Defendants' fiduciary duties owed to Zloop as its corporate counsel; and (3) aiding and abetting Boston and LaBarge's breach of their fiduciary duties owed to Zloop as its owners, managers, or directors.  Zloop is currently maintaining a separate action against Boston and LaBarge before the United States District Court for the Western District of Louisiana ("Louisiana Lawsuit").

4.      Defendants move for judgment on the pleadings pursuant to North Carolina Rule of Civil Procedure 12(c).  The Motion rests on two primary contentions: (1) the common law doctrine of *in pari delicto* bars any claim for professional malpractice; and (2) North Carolina does not recognize a claim for aiding and abetting a breach of fiduciary duty.  Defendants contend that Zloop's amended complaint ("Amended Complaint") must be dismissed because Zloop's own allegations support each of those two contentions as a matter of law.

5. Assuming solely for purposes of the Motion that all of Zloop's allegations are true, the Court concludes that the Motion must be granted and the Amended Complaint must be dismissed because, as a matter of law: (1) Zloop's claims for Defendants' professional malpractice are barred by the *in pari delicto* doctrine; (2) no claim for aiding and abetting breach of fiduciary duty has been recognized in North Carolina; and (3) even if the North Carolina Supreme Court ultimately recognizes an aiding and abetting breach of fiduciary claim, Zloop has failed to allege the essential elements of any such claim.

## II. FACTUAL BACKGROUND

6. The Court accepts the following facts and construes them in Zloop's favor solely for purposes of ruling on the Motion.

7. Zloop was in the business of recycling electronic waste, including collecting old "e-waste" (i.e., obsolete computers, televisions, and radios), crushing the materials, and then harvesting and reselling the copper, plastic, and other usable byproducts gleaned from the waste. (Am. Compl. ¶ 5, ECF No. 52.) Zloop originally intended to operate pursuant to a franchise model. (Am. Compl. ¶ 5.)

8. Boston and LaBarge incorporated Zloop as a Delaware limited liability company ("LLC") in July 2012. (Am. Compl. ¶¶ 6–8.) In November 2012, LaBarge filed Zloop's Application for Certificate of Authority with the North Carolina Secretary of State, listing himself and Boston as Zloop's sole managers. (Am. Compl. ¶ 10; Am. Compl. Ex. 3, ECF No. 52.1.)

9. In the fall of 2012, Boston and LaBarge promoted Zloop's franchise opportunity and overall potential to Louisiana resident Kendal Mosing ("Mosing"). Between November 2012 and May 2014, Mosing advanced Zloop a total of $27,498,179, which was used to purchase franchises, LLC interests, and stock; to provide loans; and to grant pledges to secure Zloop's line of credit. (Am. Compl. ¶ 11.)

10. In or before January 2013, Zloop retained the law firm of McGuire Woods LLP ("McGuireWoods") as corporate counsel in connection with a potential securities offering. (Am. Compl. ¶ 14.) McGuireWoods provided Boston and LaBarge with a draft private placement memorandum ("PPM"), which Boston and LaBarge substantially edited before distributing to investors. (Am. Compl. ¶¶ 15–16.)

11. In April 2013, Boston and LaBarge altered this PPM ("April PPM") to offer convertible debt rather than preferred equity. (Am. Compl. ¶ 17.) Schedule A of the April PPM shows Zloop's total capital as $5,100,000, nearly $5,000,000 of which Mosing had contributed by that time. (Am. Compl. ¶ 18.) The April PPM recites that Boston and LaBarge each had 6,250,000 voting units in Zloop, LLC, and that Mosing had 1,200,000 non-voting units. (Am. Compl. ¶ 17.)

12. The April PPM also included an unexecuted operating agreement that included a provision that Zloop, LLC members would be issued stock proportional to their LLC interests if Zloop, LLC was converted to a corporation. (Am. Compl. ¶ 18.)

13. In May 2013, Zloop hired Mike Watson ("Watson") as its CEO. (Am. Compl. ¶ 28.)

14.     On June 10, 2013, McGuireWoods advised Boston and LaBarge that Zloop had improperly broken the escrow provisions of its securities offering by taking and spending proceeds before the offering had closed.  (Am. Compl. ¶¶ 20, 34.)  McGuireWoods advised that immediate disclosures to investors were necessary, that Zloop should distribute a revised PPM, and that McGuireWoods would withdraw as Zloop's counsel if its advice was not followed.  (Am. Compl. ¶¶ 20–21.)

15.     Around this same time, Zloop hired Jack Jacobi ("Jacobi") and Jason Schubert ("Schubert") as its COO and CFO, respectively.  (Am. Compl. ¶ 28.)

16.     Zloop retained Parker Poe on June 19, 2013, and discharged McGuireWoods the following day.  (Am. Compl. ¶¶ 23, 26.)  When transmitting its files to Parker Poe, McGuireWoods cautioned Parker Poe that it should be aware of McGuireWoods' most recent advice to Zloop.  (Am. Compl. ¶ 27.)

17.     On July 10, 2013, Schubert began a review of Zloop's corporate records to prepare a revised PPM, and when doing so discovered numerous "red flags," including: a $1,300,000 payment for a racing contract for Boston's son, listed as an "advertising" expense; a $247,000 payment for private jet service, listed as a "marketing" expense; and a listing of Boston's wife and son as employees even though they provided no services to Zloop.  (Am. Compl. ¶¶ 31–32.)  Zloop's capitalization table, which Schubert reviewed, listed Boston, LaBarge, and their spouses as owning 87% of Zloop's voting shares even though they had made no investment, as compared to Mosing owning less than 1% of the non-voting shares even though he had, by that date, contributed $7,890,000, which sum was reflected in the table as "franchise fees."

(Am. Compl. ¶ 33.) Schubert also discovered, as had McGuireWoods, that Zloop had broken escrow in connection with its securities offering. (Am. Compl. ¶ 34.)

18. Parker Poe revised the April PPM and delivered it to Boston and LaBarge on July 12, 2013. The draft did not modify this capitalization table and made no reference to Zloop having broken escrow. (Am. Compl. ¶ 36.)

19. On July 15, 2013, Watson, Schubert, and Jacobi informed Parker Poe that they intended to immediately resign their offices unless Boston and LaBarge gave them management control of Zloop. (Am. Compl. ¶¶ 39–42.) Parker Poe was advised of the factual basis leading to the demand that Boston and LaBarge surrender management control. (Am. Compl. ¶ 42.) Parker Poe advised Boston and LaBarge to refuse the demand, and the three officers then resigned and cautioned that they should not be referenced as a source for any information to be included in a PPM. (Am. Compl. ¶¶ 44–46.)

20. On August 28, 2013, Parker Poe advised Zloop to terminate the debt offering and to provide refunds to those who had already subscribed. (Am. Compl. ¶¶ 50–51.)

21. On September 23, 2013, a Moore & Van Allen attorney representing a Zloop investor wrote Harmon, expressing concern "regarding the manner in which Zloop and [Parker Poe] have handled recent events." (Am. Compl. ¶ 57.)

22. In February 2014, Parker Poe, Boston, and LaBarge discussed the possibility of converting Zloop from an LLC to a corporation in order to facilitate Zloop's repurchase of outstanding franchises. (Am. Compl. ¶ 75.) As a part of its

efforts, Parker Poe engaged franchise attorney Eric Newman to provide an opinion regarding the legality of Zloop's outstanding franchise agreements. (Am. Compl. ¶ 75.) Mr. Newman concluded that many of Zloop's franchises had been created in violation of state and federal law. (Am. Compl. ¶ 75; Am. Compl. Ex. 35, ECF No. 52.4.)

23. On March 26, 2014, Parker Poe acted as counsel in a transaction by which Zloop converted from an LLC to a corporation, whereby 10,000 shares were issued to replace the 13,960,000 outstanding LLC units, apportioned as follows without any additional financial payment: Boston and LaBarge received 4,895 shares each; Mosing received 100 shares; and three other persons received the remaining 110 shares. (Am. Compl. ¶ 78; Am. Compl. Ex. 41.) Parker Poe did not require any valuation of Zloop in connection with the transaction. (Am. Compl. ¶ 78.) Secrist acted as Zloop's incorporator. Boston and LaBarge were elected as Zloop, Inc.'s only directors. (Am. Compl. ¶¶ 80–82; Am. Compl. Ex. 41A.)

24. On March 27, 2014, Parker Poe provided Boston and LaBarge with a PPM that contemplated Zloop's termination of outstanding franchises in exchange for cash or Zloop stock. (Am. Compl. ¶¶ 82–83.) This PPM did not disclose the various facts regarding the earlier break in escrow, any opinion regarding the illegality of the outstanding franchises, or the misconduct reported by the officers who had earlier resigned. (Am. Compl. ¶¶ 82–83.)

25. At least by May 29, 2014, Parker Poe had become aware that Mosing had accused Zloop of misusing its $14,000,000 line of credit that Mosing had secured. (Am. Compl. ¶ 93.)

26. On June 26, 2014, Parker Poe arranged for a "friends and family" offering, whereby Boston and LaBarge offered to sell their Zloop stock to family and close friends. (Am. Compl. ¶ 97.)

27. At some point, Mosing discovered that Boston and LaBarge had fabricated a UCC-1 financing statement that Mosing had relied on to perfect his security interest in some of Zloop's North Carolina property. (Am. Compl. ¶ 100.)

28. On August 28, 2014, Mosing initiated the Louisiana Lawsuit, naming Boston, LaBarge, and Zloop as defendants. (Am. Compl. ¶¶ 100–02.)

29. In February 2015, Parker Poe ceased representing Zloop. (Am. Compl. ¶ 108.)

30. On August 10, 2015, Zloop filed for bankruptcy in Delaware. Ultimately, the bankruptcy proceeding developed evidence that: Boston purchased six personal vehicles with Zloop funds; LaBarge purchased three personal vehicles with Zloop funds; Boston and LaBarge took personal advances of at least $2,763,504; Boston spent at least $4,648,103.59 of Zloop funds to benefit the racing career of his son, Justin; Boston and LaBarge purchased a personal airplane using Zloop funds; Boston and LaBarge purchased a property in Hickory, North Carolina using Zloop funds but without giving title to Zloop; and Zloop assets were sold to pay for millions of dollars of Zloop's bankruptcy professional expenses. (Am. Compl. ¶¶ 108, 111.)

31. The Delaware bankruptcy court approved a chapter 11 liquidation plan, which granted Mosing an unsecured claim of $40,000,000. (Am. Compl. ¶112.)

32. A review of the record in the Louisiana Lawsuit reveals that on December 20, 2016, Mosing caused Zloop to be realigned from a defendant to a plaintiff. (Defs.' First Am. Answer Ex. A, Second Am. Supp. Restated Compl. ¶ 2, ECF No. 34 ("LA Am. Compl.").) Zloop then filed an amended complaint in that action on March 29, 2017 ("Louisiana Amended Complaint").

33. The Court has become aware that LaBarge pleaded guilty to conspiracy to commit wire fraud on November 2, 2017, and that a federal jury convicted Boston of conspiracy, wire fraud, securities fraud, and money laundering on December 8, 2017. *U.S. v. Boston*, Docket No. 3:17-CR-00114-RJC-DSC, ECF Nos. 41, 44, 71.

## III. PROCEDURAL BACKGROUND

34. Zloop filed its initial complaint in this action in the Mecklenburg County Superior Court on April 17, 2017.

35. On April 24, 2017, Defendants filed a Notice of Designation as Mandatory Complex Business Case under N.C. Gen. Stat. §7A-45.4(a). The case was so designated by the Chief Justice and assigned to the undersigned that same day.

36. On June 26, 2017, Defendants filed their answer and the Motion.

37. The Court calendared the Motion for hearing on September 8, 2017.

38. On September 7, 2017, Zloop moved for leave to file an amended complaint and provided Defendants' counsel with the proposed amended complaint.

39.     On September 8, 2017, the Court held the hearing as noticed, based on its understanding from counsel that the allegations in the proposed amended complaint added additional factual allegations but did not substantively add to or change the causes of action asserted in the initial complaint or alter the bases on which Defendants had moved to dismiss the action. The parties agreed that the Motion, briefing, and argument could be deemed to have been made in response to the proposed amended complaint if the Court elected to grant leave to file it. (Hearing Tr. 7:7–22, Sept. 8, 2017.)

40.     On September 11, 2017, with Defendants' consent, the Court granted Zloop's motion for leave to amend, and Zloop filed the Amended Complaint on September 25, 2017, which Defendants answered on September 29, 2017.

41.     As agreed by the parties, the Court treats the Motion as having been presented, briefed, and argued in connection with the Amended Complaint and Defendants' answer.

42.     The Motion is ripe for resolution.

## IV.  STANDARD OF REVIEW

43.     Judgment on the pleadings is "appropriate when all the material allegations of fact are admitted in the pleadings and only questions of law remain. Judgments on the pleadings are disfavored in law, and the trial court must view the facts and permissible inferences in the light most favorable to the non-moving party." *Shehan v. Gaston Cty.,* 190 N.C. App. 803, 806, 661 S.E.2d 300, 303 (2008) (quoting *Carpenter v. Carpenter,* 189 N.C. App. 755, 757, 659 S.E.2d 762, 765 (2008)). Courts

should grant 12(c) motions only when a plaintiff has either failed to allege facts necessary to support a cause of action or has pleaded facts which defeat that claim. *Robertson v. Boyd*, 88 N.C. App. 437, 440, 363 S.E.2d 672, 675 (1988). The Court does not make findings of fact in ruling upon a 12(c) motion and, in considering the motion, assumes the truth of the nonmovant's factual averments. *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).

44. As a general proposition, "[i]n deciding a motion for judgment on the pleadings, the trial court looks solely to the pleadings" in the action at bar, *Reese v. Mecklenburg Cty.*, 204 N.C. App. 410, 421, 694 S.E.2d 453, 461 (2010) (citing *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 206, 171 S.E.2d 873, 878 (1970)), and considers only facts that have been properly pleaded and documents that are attached to, referred to, or incorporated by the pleadings. *Wilson*, 276 N.C. at 206, 171 S.E.2d at 878–79; *see, e.g.*, *Holcomb v. Landquest Ltd. Liab. Co.*, No. 16 CVS 10147, 2017 NCBC LEXIS 36 at *9–10 (N.C. Super. Ct. Apr. 21, 2017) (holding that the Court may consider a complaint filed in an earlier case if it was filed in the same court and referred to in the current complaint). A court may also consider documents that memorialize events to which the complaint makes "clear reference," *Reese v. Charlotte-Mecklenburg Bd. of Educ.*, 196 N.C. App. 539, 546, 676 S.E.2d 481, 486 (2009), documents upon which the plaintiff is suing, even if the documents are not included in the complaint, *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 126, 254 S.E.2d 217, 220 (1979), and allegations or exhibits presented by the movant's own pleadings if the nonmovant has admitted the truth of allegations or the authenticity of the

documents.  *See Horne v. Town of Blowing Rock*, 223 N.C. App. 26, 30, 732 S.E.2d 614, 617 (2012); *Reese*, 196 N.C. App. at 561, 676 S.E.2d at 496; *Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204–05, 652 S.E.2d 701, 708 (2007).

45.     Additionally, a court may properly consider matters of which it may take judicial notice without converting a Rule 12(c) motion to one for summary judgment. *See Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that courts may take judicial notice on a 12(b)(6) motion without converting the proceeding to one for summary judgment); *N.C. State Bar v. Lienguard, Inc.*, No. 11 CVS 7288, 2014 NCBC LEXIS 11, at *5 (N.C. Super. Ct. Apr. 4, 2014) (taking judicial notice on a Rule 12(c) motion).  A judicially noticeable fact is one that is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." N.C. Gen. Stat. § 8C-1, Rule 201(b) (2015); *see also Smith v. Beaufort Cty. Hosp. Ass'n*, 141 N.C. App. 203, 211, 540 S.E.2d 775, 780 (2000).

46.     Courts may in their discretion take judicial notice of court filings made in other jurisdictions.  *Muteff v. Invacare Corp.*, 218 N.C. App. 558, 569, 721 S.E.2d 379, 387 (2012) (citing *West v. G.D. Reddick, Inc.*, 302 N.C. 201, 203, 274 S.E.2d 221, 223 (1981)) (holding that the trial court did not err in judicially noticing a certain Texas Supreme Court opinion because the opinion was "capable of demonstration by readily accessible sources of indisputable accuracy"); *see also, e.g., Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) (noting with approval that the district court, in a 12(b)(6) proceeding, had judicially noticed "the

indisputable facts that those documents [filed in other jurisdictions] exist, they say what they say, and they have had legal consequences"); *Rothman v. Gregor*, 220 F.3d 81, 91–92 (2d Cir. 2000) (reviewing a trial court's dismissal under 12(b)(6) and taking judicial notice—as a public record—of a complaint filed by one of the parties in a different jurisdiction when neither party contested the accuracy of the extrinsic complaint); *In re FedEx Ground Package Sys.*, 2010 U.S. Dist. LEXIS 30303, at *10 (N.D. Ind. Mar. 29, 2010) (citing *Gen. Elec. Capital v. Lease Resolution*, 128 F.3d 1074, 1081 (7th Cir. 1997)) ("Court documents from another case may be used to show that the document was filed, that [a] party *took a certain position*, and that certain judicial findings, allegations or admissions were made.") (emphasis added).

## V. ANALYSIS

### A. North Carolina Law Governs Zloop's Claims.

47. Zloop's claims directly against Boston and LaBarge in the Louisiana Lawsuit are likely governed by Delaware law pursuant to the internal affairs doctrine. *See Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680–81, 657 S.E.2d 55, 63 (2008) (affirming a trial court's application of the internal affairs doctrine to determine that New York law governed a derivative claim against a New York corporation). In contrast, Zloop's claims against Defendants are more properly resolved pursuant to North Carolina law. *See Harco Nat'l. Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722 (2010) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988) (holding that in general, "matters affecting the substantial rights of the parties are determined by *lex*

*loci*, the law of the situs of the claim . . . . For actions sounding in tort, the state where the injury occurred is considered the situs of the claim."); *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, No. 15 CVS 16388, 2017 NCBC LEXIS 4, at \*12 (N.C. Super. Ct. Jan. 12, 2017) (citing *Harco*, 206 N.C. App. at 692, 698 S.E.2d at 722–23) ("North Carolina's choice of law principles applicable to claims affecting the substantial rights of the parties, such as torts, should be applied to . . . aiding and abetting claim[s]."). Here, because Zloop alleges that Defendants' acts were performed in or directed from Defendants' Charlotte, North Carolina office, (Am. Compl. ¶ 2), North Carolina law governs the Motion. However, as will be evident from the Court's discussion below, the choice of law is not determinative, for the Motion's outcome would be the same whether Delaware or North Carolina law applied.

B. **An *In Pari Delicto* Defense is Available Regarding Zloop's Legal Malpractice and Breach of Fiduciary Duty Claims.**

    (1) **North Carolina courts have adopted the *in pari delicto* doctrine.**

48. North Carolina courts "have long recognized the *in pari delicto* doctrine, which prevents the courts from redistributing losses among wrongdoers." *Whiteheart v. Waller*, 199 N.C. App. 281, 285, 681 S.E.2d 419, 422 (2009). The defense operates to bar a plaintiff's claims when the plaintiff is at least equally at fault with the defendant and the allegedly wrongful conduct complained of is the subject of the lawsuit. *See, e.g.*, *Freedman v. Payne*, 784 S.E.2d 644, 649 (N.C. App. 2016); *Byers v. Byers,* 223 N.C. 85, 90, 25 S.E.2d 466, 469–70 (1943) ("The law generally forbids

redress to one for an injury done him by another, if he himself first be in the wrong about the same matter whereof he complains.").

**(2)** **Whether a fiduciary's wrongs will be imputed to his principal in order to apply the *in pari delicto* doctrine is ultimately a question of agency.**

49. Imputation of wrongdoing is not necessary to apply the *in pari delicto* doctrine when the plaintiff is himself the wrongdoer. *See, e.g.*, *Byers*, 223 N.C. at 90, 25 S.E.2d at 470 (plaintiff-husband denied divorce decree based on a condition he wrongfully created). However, in an action by a corporation, the *in pari delicto* doctrine may be used to bar the corporation's claims only where the acts of its owners or agents are imputed to the corporation through the laws of agency. *See Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010). The question of whether misconduct will be imputed becomes more complex when the agent acts primarily for personal benefit, but also under color of corporate authority and in a manner that benefits the corporation in some way.

50. The facts of this case fall between two well-established agency principles. On one hand, a principal is generally bound by the knowledge and acts of its agent when the agent clearly acts within the scope of his authority to conduct the principal's business. *Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 222 (1923) (imputing to a corporation knowledge that its vice president had fraudulently obtained patents on its behalf); *see also Sparks v. Union Tr. Co.*, 256 N.C. 478, 482, 124 S.E.2d 365, 368 (1962) (describing "the general rule that knowledge of the agent is imputed to the principal"); *Stewart v. Wilmington Tr. SP*

*Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015) ("A basic tenet of corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."). On the other hand, a corporation is generally presumed not to have knowledge of or be liable for the actions of an agent who entirely abandons the corporation's interests and acts wholly outside the scope of the agent's authority for her personal benefit. *Sparks*, 256 N.C. at 482, 124 S.E.2d at 368. This latter rule is summarized as follows:

> [w]here the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, or where the agent, acting nominally as such, is in reality acting in his own business or for his own personal interest and adversely to the principal, or has a motive in concealing the facts from the principal, this [imputation] rule does not apply.

*Id.* (quoting *Fed. Res. Bank v. Duffy*, 210 N.C. 598, 603, 188 S.E. 82, 84 (1936)).

51. Other courts have referred to this agency rule as the "adverse interest" exception, meaning that acts of an agent taken for personal benefit, outside the scope of agency, and adverse to the principal's interest will not be imputed. *See, e.g.*, *Kirschner*, 938 N.E.2d at 950–51. North Carolina courts have not adopted the exception by name, but have applied the underlying reasoning. *See Sledge Lumber Corp. v. S. Builders Equip. Co.*, 257 N.C. 435, 439, 126 S.E.2d 97, 100 (1962) (quoting *Brite v. Penny*, 157 N.C. 110, 114, 72 S.E.2d 964, 965 (1911)) ("[A] corporation is not bound by the action or chargeable with the knowledge of its officers or agents in respect to a transaction in which such officer or agent is acting in his own behalf, and does not act in *any* official or representative capacity for the corporation.") (emphasis

added); *see also Wilson Lumber & Milling Co. v. Atkinson*, 162 N.C. 298, 305, 78 S.E.2d 212, 215 (1913) ("[I]f the agent is engaged in perpetrating an *independent fraud on his own account*, knowledge of facts relating to the fraud will not be imputed to the principal.") (emphasis added); *Bank of Proctorville v. West*, 184 N.C. 220, 223, 114 S.E.2d 178, 180 (1922) ("[T]he [imputation] rule fails . . . where the agent is engaged in the transaction in which he is interested adversely to his principal, or is *engaged in a scheme to defraud the latter*.") (emphasis added); *Tillery Envtl. LLC v. A&D Holdings, Inc.*, No. 17 CVS 6525, 2018 NCBC LEXIS 13, at \*29 (N.C. Super. Ct. Feb. 8, 2018) (quoting *Norburn v. Mackie*, 262 N.C. 16, 23, 136 S.E.2d 279, 284–85 (1964)) ("A principal is generally 'responsible to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and *within the scope of the agent's actual or apparent authority from the principal*.'") (emphasis added).

52. Here, the Court is required to determine whether Boston's and LaBarge's acts will be imputed to Zloop where their acts, although primarily for personal benefit, were taken under the color of their authority to act for Zloop and Zloop received at least some incidental benefit from their wrongs.

**(3) The North Carolina Court of Appeals' decision in *CommScope* is neither controlling nor persuasive precedent.**

53. The North Carolina Court of Appeals considered the application of *in pari delicto* in the context of professional malpractice claims asserted by a corporation against its accounting firm. *CommScope Credit Union v. Butler & Burke, LLP*, 237 N.C. App. 101, 103, 764 S.E.2d 642, 646 (2014), *aff'd in part, rev'd in part*, 369 N.C.

48, 790 S.E.2d 657 (2016). In *CommScope*, the IRS required the credit union to pay a significant tax deficiency and assessment after the credit union's general manager failed to file various forms that would have avoided taxation and the accounting firm did not discover the failure. *Id.* at 102, 764 S.E.2d at 645–46. The credit union asserted claims against its accounting firm for professional malpractice, negligence, and breach of fiduciary trust. *Id.* at 103, 764 S.E.2d at 646. The accounting firm asserted an *in pari delicto* defense based on the credit union's general manager's negligence. *Id.* The trial court granted Rule 12(b)(6) and 12(c) motions based on the defense. *Id.* The Court of Appeals reversed. *Id.*

54. The Court of Appeals held, as a matter of law, that the general manager's acts could not be imputed to the credit union. *Id.* at 108–09, 764 S.E.2d at 649–50. It premised its holding on two determinations: first, that there was no basis to conclude that the general manager was acting within the scope of his employment when he failed to file tax returns because, in so failing, he did not advance the credit union's interests in any way; and second, that the complaint did not allege that the general manager's actions constituted wrongs that were at least equal to the defendant-accounting firm's own wrongs in failing to implement proper auditing procedures. *Id.*

55. On discretionary review, the Supreme Court of North Carolina accepted the case to determine whether the accounting firm had a fiduciary duty and whether the claims against it were barred by the *in pari delicto* doctrine. It then affirmed in part and reversed in part. *CommScope*, 369 N.C. at 51, 790 S.E.2d at 659. The

Supreme Court justices were equally divided on whether the *in pari delicto* defense barred the claim, thus leaving the Court of Appeals' holding regarding *in pari delicto* "undisturbed" but standing "without precedential value." *Id.* at 58, 790 S.E.2d at 663.

56. Zloop, however, argues that the Court of Appeals' holding in *CommScope* doctrine is binding and dispositive as to the application of the *in pari delicto* doctrine in this case. Zloop erroneously relies on *In re Appeal from Civil Penalty Assessed for Violations of Sedimentation Pollution Control Act etc.*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989), which held that "[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." *Id.* A different rule governs Court of Appeals decisions affirmed by an evenly-divided Supreme Court. *See, e.g.*, *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 694, 682 S.E.2d 726, 732 (2009) (holding that *Currituck Assocs. Residential P'ship v. Hollowell*, 166 N.C. App. 12, S.E.2d 256, *aff'd per curiam by an equally divided court*, 360 N.C. 160, 622 S.E.2d 493 (2005), was not controlling); *Daniels v. Durham Cty. Hosp. Corp.*, 171 N.C. App. 535, 540–41, 615 S.E.2d 60, 64 (2005) (rejecting the decision in *Campbell v. Pitt Cty. Mem'l Hosp., Inc.*, 84 N.C. App. 314, 352 S.E.2d 902 (1987), *aff'd by an equally divided supreme court*, 321 N.C. 260, 362 S.E.2d 273 (1987), because "the North Carolina Supreme Court was evenly divided and accordingly affirmed the *Campbell* opinion, but stripped it of precedential value"); *Elliot v. N.C. Dep't of Human Res.*, 115 N.C. App. 613, 620, 446 S.E.2d 809, 813 (1994) (noting that the court must "analyze this question without regard to this Court's decision in

*Kempson* [*v. N.C. Dep't of Human Res.*, 100 N.C. App. 482, 397 S.E.2d 314 (1990), *aff'd by an equally divided Supreme Court*, 328 N.C. 722, 403 S.E.2d 279 (1991)]" because *Kempson* stood without precedential value), *aff'd per curiam*, 341 N.C 191, 459 S.E.2d 273 (1995); *Blitz v. Xpress Image, Inc.*, No. 05 CVS 679, 2006 NCBC LEXIS 12, at *26 n.12 (N.C. Super. Ct. Aug. 23, 2006) ("Because *Pitts* was affirmed by [an] equally divided Supreme Court, it stands without precedential value. After considering the analysis in *Pitts*, the Court declines to adopt its conclusion."). Under this rule, the Court of Appeals' *CommScope* holding regarding *in pari delicto* is not binding precedent.

57. Although it is not binding, the Court has further considered whether the Court of Appeals' *CommScope* holding regarding *in pari delicto* is persuasive authority. *Cf. Lord v. Beerman*, 191 N.C. App. 290, 296 n.3, 664 S.E.2d 331, 336 (2008) (holding that a case cited by a party, which had been affirmed by an evenly divided Supreme Court, "may be persuasive authority in this case"). The Court concludes that there are several factual distinctions that make the *CommScope* opinion of little relevance. First, the Amended Complaint reveals that Zloop enjoyed at least some benefit from Boston's and LaBarge's wrongful conduct, whereas CommScope received no benefit from its agent's failure to act. Second, the Amended Complaint reveals substantially more aggravated wrongful conduct by Boston and LaBarge than was at issue in *CommScope,* where it was clear that the Court of Appeals was persuaded that the auditing firm's malfeasance far outweighed the agent's failure to file tax forms. *Commscope*, 237 N.C. App. at 108, 764 S.E.2d at 649

("[N]othing in Plaintiff's complaint establishes that [the agent]'s failure to file the tax forms was an example of intentional wrongdoing, as opposed to negligence, or for that matter, that [the agent]'s alleged failure was not excusable conduct.").

**(4)** **An agent's wrongful acts, even when taken primarily for personal benefit, will be imputed to the corporation when they yield some benefit to the corporation.**

58.     There is then no controlling North Carolina precedent teaching whether the *in pari delicto* doctrine bars a corporation's claims against its professional services providers when such claims are based on the corporation's agent's intentional, wrongful conduct that, while motivated by personal gain, nevertheless benefited the corporation in some way and is at least equal to the conduct charged against the professional services provider.    In the absence of such precedent, the Court appropriately considers decisions from other jurisdictions, particularly Delaware. *White v. Hyde*, No. 16 CVS 1330, 2016 NCBC LEXIS 74, at *15 (N.C. Super. Ct. Oct. 4, 2016) ("Absent guidance from the North Carolina appellate courts, this Court may look to, but is not controlled by, Delaware law."); *First Union Corp. v. Suntrust Banks, Inc.*, Nos. 1 CVS 100075, 4486, 8036, 2001 NCBC LEXIS 7, at *31 (N.C. Super. Ct. Aug. 10, 2001) ("North Carolina courts have frequently looked to Delaware for guidance because of the special expertise and body of case law developed in the Delaware Chancery Court and the Delaware Supreme Court.").    It is particularly appropriate here to consider Delaware law as Zloop is incorporated in Delaware. (Am. Compl. ¶ 8.)

59.     Delaware recognizes but then narrowly applies the adverse interest exception and will impute an agent's wrongful, self-serving conduct to the corporation so long as even a minor, incidental, or illusory benefit flows to the corporation from those wrongful acts. Vice Chancellor Parsons' opinion in *Stewart v. Wilmington Trust SP Services, Inc.*, illustrates how the Delaware Chancery Court applies the exception. 112 A.3d 271 (Del. Ch. Mar. 26, 2015), *aff'd*, 126 A.3d 1115 (Del. Nov. 2, 2015). In *Stewart*, the receiver for insurance companies that had been defrauded by their controlling owner brought breach-of-contract, negligence, and aiding and abetting breach of fiduciary duty claims against its auditors for their failure to timely discover and mitigate the owner's pervasive fraud. *Id.* at 282–89. Even though Vice Chancellor Parsons assumed that the owner had siphoned off funds for purely personal use, he found that the owner's bad acts should still be imputed to the companies because the owner's acts provided some benefits to them, even if temporary and ultimately illusory. *Id.* at 310–11 (noting that the owner's "machinations," including fraudulently obtaining the companies' authorization as Delaware-domiciled insurers, improved, "if only for a time," the companies' position). Accordingly, Vice Chancellor Parsons upheld the *in pari delicto* defense.

60.     In allowing the defense, Vice Chancellor Parsons explained that "[where a high-level officer or director also solely owns or otherwise dominates the corporation, the principal-agent distinction virtually disappears." *Id.* at 311. Stated otherwise, the "adverse interest exception will not aid an agent-principal who does wrong by protecting the corporation he controls from the effect of *in pari delicto*." *Id.*

61. New York likewise follows the rule that an agent's wrongful acts are imputed to the corporate principal unless the agent totally abandons the principal's interest and provides no benefit to the corporation. *Kirschner*, 938 N.E.2d at 952. Other courts recognize this rule, but condition its application in some circumstances. For example, Pennsylvania allows a professional services firm to pursue an *in pari delicto* defense only if it demonstrates that it dealt with the corporation's wrongdoing agent in good faith. *Official Comm. Unsecured Creditors Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 989 A.2d 313, 335 (2010). New Jersey bars the *in pari delicto* defense by a professional services firm that "is negligent within the scope of its engagement." *NCP Litig. Tr. v. KPMG LLP*, 901 A.2d 871, 889 (2006).

62. The Court concludes that, on the facts of this case, the North Carolina Supreme Court would adopt the Delaware and New York approach and impute to a corporation the acts of its agents when the agents' acts are taken under color of authority and at least marginally benefit the corporation. Boston's and LaBarge's acts should then be imputed to Zloop so long as their conduct occurred in their corporate capacities and benefitted Zloop.

63. Zloop's own allegations in the Amended Complaint demonstrate that (1) Boston and LaBarge acted as Zloop's owners or directors when engaging in their misconduct, (Am. Compl. ¶ 96 (Boston and LaBarge committed "fraudulent acts *in their operation of Zloop* and dealings with investors") (emphasis added)), and (2) that Zloop received at least some benefit from the wrongful conduct, particularly in Boston

and LaBarge's raising funds for Zloop's operation. (*See e.g.*, Am. Compl. ¶¶ 11, 83 (Boston and LaBarge's fraud allowed Zloop to temporarily remain in business and obtain franchises and lines of credit).)  As such, Boston's and LaBarge's acts are imputed to Zloop as a matter of law.

## C. *In Pari Delicto* Bars Zloop's Legal Malpractice and Breach of Fiduciary Duty Claims.

64. For purposes of the Motion, the Court accepts as true Zloop's allegations that Defendants committed professional malpractice. The Court must determine whether claims based on that malpractice are barred by the doctrine of *in pari delicto*.

### (1) Claims grounded on Defendants' duties as corporate counsel are subject to the *in pari delicto* doctrine.

65. Professional negligence claims are subject to a defense grounded on the *in pari delicto* doctrine. *Whiteheart*, 199 N.C. App. at 287, 681 S.E.2d at 423. Although couched as a fiduciary duty claim, Zloop's claim for Defendants' professional malpractice is to be treated as a negligence claim.  *Heath v. Craighill, Rendleman, Ingle & Blythe, P.A.*, 97 N.C. App. 236, 244, 388 S.E.2d 178, 183 (1990) ("Breach of fiduciary duty is a species of negligence or professional malpractice.").  Zloop's claims for Defendants' professional malpractice are then subject to an *in pari delicto* defense whether pleaded as a negligence claim or a breach of fiduciary duty claim.

### (2) Zloop's allegations render the *in pari delicto* defense complete against its professional malpractice claims as a matter of law.

66. In addition to concluding that Boston's and LaBarge's conduct must be imputed to Zloop, before applying the *in pari delicto* doctrine, the Court must also be satisfied that their conduct is at least equal to the wrongs asserted against

Defendants. *See Freedman*, 784 S.E.2d at 649. That is an easy conclusion to reach based on Zloop's own allegations, which unequivocally demonstrate that Boston's and LaBarge's intentional and criminal conduct was at least equal to, if not substantially more egregious, than Defendants' alleged misconduct, which is based in negligence rather than in knowing and intentional misconduct or fraud. (*See, e.g.*, Am. Compl. ¶¶ 83(c), (y), 96, 102, 104, 111.) Accordingly, the Court concludes that Zloop's own pleading demonstrates that Zloop's legal malpractice and breach of fiduciary duty claims are barred by the *in pari delicto* doctrine as a matter of law.

### (3) No Public Policy Overrides the Defense.

67. Zloop seeks to avoid the *in pari delicto* defense by claiming that applying the doctrine here would be inconsistent with the policies on which the doctrine is based. (*See* Pl's. Br. Opp. Defs.' Mot. J. Pleadings 22, ECF No. 48 ("Equity and public policy support giving victims redress against all those who contributed to their injuries.").)

68. The *in pari delicto* doctrine has been broadly recognized as promoting two primary policies: deterring wrongful conduct by refusing wrongdoers any legal or equitable relief, and protecting against the misuse of judicial resources. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). Courts have occasionally referenced other policies, such as: (1) providing proper incentives for corporations to police their own conduct, *Kirschner*, 938 N.E.2d at 951–52 ("[I]mputation fosters an incentive for a principal to select honest agents and delegate duties with care."); (2) maintaining the integrity of the corporate form, *Stewart*, 112

A.3d at 303 (quoting *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 893 (2009)) ("Though at [a] superficial level it may appear harsh to hold an "innocent" corporation (and, ultimately, its stockholders) to answer for the bad acts of its agents, such 'corporate liability is essential to the continued tolerance of the corporate form, as any other result would lack integrity.'"); (3) not giving corporations rights which natural persons do not have, *In re Am. Int'l Group, Consol. Derivative Litig.*, 976 A.2d at 893. ("[T]he operative point is that [not allowing an *in pari delicto* defense in this case] would allow corporations to sue their own co-conspirators for actions that were undertaken, at least in part, for the corporation's own interest, giving corporations rights that natural persons do not have."); and (4) giving deference to federal statutory schemes that rely on private rights of action for enforcement. *See, e.g.*, *Pinter v. Dahl*, 486 U.S. 622, 633 (1988) (noting that "broad judge-made law" including *in pari delicto* should not "undermine the congressional policy favoring private suits as an important mode of enforcing federal securities actions"); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (refusing to apply *in pari delicto* in antitrust cases).

69.     The Court believes the following admonition of our Supreme Court dispenses with the policy arguments:

> [t]he allegations of the complaint are discreditable to both parties. They blacken the character of the plaintiff as well as soil the reputation of the defendant. As between them, the law refuses to lend a helping hand. The policy of the civil courts is not to paddle in muddy water, but to remit the parties, when *in pari delicto*, to their own folly. So, in the instant case, the plaintiff must fail in his suit.

*Bean v. Home Detective Co.*, 206 N.C. 125, 126, 173 S.E. 5, 6 (1934).

70.    In sum, the Court concludes that *in pari delicto* bars Zloop's claims for Defendants' alleged professional malpractice.  The Court now turns to whether Zloop's claim for Defendants' aiding and abetting Boston and LaBarge's breaches of fiduciary duty must also be dismissed.

**D.    Zloop's Aiding and Abetting Breach of Fiduciary Duty Claim must also be Dismissed.**

   **(1)    An aiding and abetting breach of fiduciary duty claim does not exist in North Carolina until it is recognized by North Carolina appellate courts.**

71.    It is axiomatic that Zloop's aiding and abetting breach of fiduciary duty claim must be dismissed if the cause of action is not recognized in North Carolina. The Court now concludes that on appeal the North Carolina Supreme Court will hold that North Carolina does not recognize a claim of aiding and abetting breach of fiduciary duty.  Alternatively, for the reasons discussed below, the Court further finds that, should the North Carolina Supreme Court recognize such a claim, Zloop's Amended Complaint nevertheless fails because Zloop has not, as a matter of law, alleged the essential elements of any such claim.

72.    This Court has in earlier opinions noted the uncertainty regarding whether North Carolina recognizes an aiding and abetting breach of fiduciary duty claim.  *Tong v. Dunn*, No. 11 CVS 1522, 2012 NCBC LEXIS 16, at *12 (quoting *Battleground Veterinary Hosp., P.C. v. McGeough*, No. 05 CVS 18918, 2007 NCBC LEXIS 33 at *17 (N.C. Super. Ct. Oct. 19, 2007)) ("Without a definitive recent statement from our appellate courts, '[i]t remains an open question whether North Carolina law recognizes' the claim.") (alteration in original); *see also Islet Scis., Inc.*,

2017 NCBC LEXIS 4, at \*14 ("North Carolina's appellate courts have not, to-date, expressly recognized a cause of action for aiding and abetting breach of fiduciary duty."). Federal courts in North Carolina have approached the claim differently. In *Laws v. Priority Trustee Services. of N.C., L.L.C.*, 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009), the court observed that "the Supreme Court of North Carolina has never recognized [a cause of action for aiding and abetting breach of fiduciary duty]." Another decision from the Western District dismissed a claim against an attorney who allegedly personally promoted a Ponzi scheme to investors because "North Carolina does not recognize [an aiding and abetting breach of fiduciary duty] claim." *Bell v. Kaplan*, No. 3:14CV352, 2016 U.S. Dist. LEXIS 24408, at \*15 (W.D.N.C. Feb. 29, 2016). In contrast, a decision from the bankruptcy court in the Middle District concluded that "North Carolina law recognizes a cause of action for aiding and abetting breach of fiduciary duty." *Moseley v. Arth*, Case No. 2003 Bankr. LEXIS 1437, at \*49 (Bankr. M.D.N.C. 2003).

73. The Court now concludes and holds that North Carolina does not recognize a claim of aiding and abetting breach of fiduciary duty. Accordingly, Zloop's aiding-and-abetting claim must be dismissed.

74. The following analysis supports the Court's alternative holding that Zloop has failed, as a matter of law, to allege the essential elements of any aiding and abetting breach of fiduciary duty claim that may be recognized in North Carolina.

**(2)** **The Court need not address the question of whether any aiding and abetting breach of fiduciary duty claim is subject to the _in pari delicto_ doctrine.**

75.     Zloop alleges that the breaches of fiduciary duty from which its aiding-and-abetting claim derives arise from Boston and LaBarge's duties as Zloop's owners, managers, or directors.  Generally, the _in pari delicto_ doctrine is not applied to bar a claim by a corporation against its own wrongdoing agents.  _See, e.g., In re Am. Int'l Grp., Inc., Consol. Derivative Litig._, 976 A.2d at 890 (noting that public policy is best served by not applying _in pari delicto_ in suits brought by corporations against their own insiders and agents).  Some have referred to this rule of law as the "fiduciary duty exception" to _in pari delicto_.  _Stewart_, 112 A.3d at 304; _see also In re HealthSouth Corp. S'holders Litig._, 845 A.2d 1096, 1107 (Del. Ch. 2003) (noting that "because corporations must act through living fiduciaries . . . the application of the _in pari delicto_ doctrine has been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own conduct vis-a-vis their corporations" and concluding that a contrary holding would be "transparently silly").

76.     It is less clear whether the _in pari delicto_ doctrine would apply to a corporation's claim against those who aided that breach.  Delaware apparently would not recognize an _in pari delicto_ defense to at least certain aiding-and-abetting claims in that context.  _Stewart_, 112 A.3d at 318–20.  In allowing an aiding-and-abetting claim against auditors to proceed even when professional malpractice claims were rejected, Vice Chancellor Parsons determined that the _in pari delicto_ doctrine should not bar aiding-and-abetting claims against an auditor that enjoyed a special

relationship with the companies that would have allowed it to discover and mitigate the agent's wrongdoing.  *Stewart*, 112 A.3d at 318–20.

77.     If the *in pari delicto* doctrine applies to Zloop's aiding-and-abetting claim, the defense is complete and the claims are barred by that doctrine as a matter of law for the same reasons the doctrine bars Zloop's professional malpractice claims. The Court need not consider that issue further because the Court finds that Zloop's aiding-and-abetting claim fails whether or not *in pari delicto* applies because Zloop has failed to allege the essential elements of the claim.

**(3)     If the Supreme Court of North Carolina recognizes an aiding and abetting breach of fiduciary duty claim, it will impose elements at least as demanding as a claim defined by the Restatement (Second) of Torts § 876(b).**

78.     The Restatement (Second) of Torts recognizes potential liability for those acting in concert, stating that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Restatement (Second) of Torts § 876(b) (Am. Law Inst. 1979).  Most jurisdictions that impose aider-abettor liability do so under Section 876 and incorporate its elements.  *See, e.g.*, *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) (citing Section 876 in discussing aiding-and-abetting claims).

79.     The North Carolina Supreme Court has not yet considered an aiding and abetting breach of fiduciary duty claim grounded on Section 876.  *Tong*, 2012 NCBC LEXIS 16, at *5 n.3 ("The North Carolina Supreme Court . . . expressly

adopted Section 876 as it applies to the negligence of joint tort-feasors [in *Boykin v. Bennett,* 253 N.C. 725, 118 S.E.2d 12 (1961)], but has not been presented with the question of its applicability to aiding and abetting claims."). The North Carolina Court of Appeals endorsed Section 876 when analyzing an aiding-and-abetting claim in the securities context. *Blow v. Shaughnessy*, 88 N.C. App. 484, 490–91, 364 S.E.2d 444, 447 (1988) (citing Section 876 in recognizing a cause of action for aiding and abetting breach of fiduciary duty and observing many federal courts' use of Section 876 in recognizing such claims). The Supreme Court of the United States later held that a private plaintiff may not maintain an aiding-and-abetting suit under section 10b. *Cent. Bank of Denver*, 511 U.S. at 191. That holding casts substantial doubt on the continued vitality of *Blow*. *Laws v. Priority Tr. Servs. of N.C., L.L.C,* 610 F. Supp. 2d 528, 532 (W.D.N.C.2009).

80. Courts in other jurisdictions since *Central Bank of Denver* have adopted Section 876 when analyzing claims that attorneys aided and abetted a client's breach of duty. *See, e.g.*, *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003); *Reynolds v. Schrock*, 142 P.3d 1062, 1066 (Or. 2006); *Thornwood, Inc. v. Jenner & Block*, 799 N.E. 2d 756 (Ill. Ct. App. 2003).

81. The Court concludes that if the North Carolina Supreme Court recognizes an aiding-and-abetting claim, it will base the elements of any such claim on Section 876(b). *See Tong*, 2012 NCBC LEXIS 16, at *13 (citing Section 876 in evaluating an assumed aiding-and-abetting claim); *see also Sompo Japan Ins., Inc. v. Deloitte & Touche, LLP*, No. 03 CVS 5547, 2005 NCBC LEXIS 1, at *3 (N.C. Super.

Ct. June 10, 2005) (noting that North Carolina courts will "adopt Section 876 on a case-specific basis guided by the 'concert of action' involved").

82.     In *Blow*, the Court of Appeals, citing to Section 876, held that the

> prerequisites necessary to establish aiding and abetting liability . . . include: (1) the existence of a . . . violation by the primary party; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.

*Blow*, 88 N.C. App at 490, 364 S.E.2d at 447.

83.     The parties do not dispute that Boston and LaBarge breached a fiduciary duty owed to Zloop. There is then, no contest that Zloop has adequately alleged the first element of its claim. Defendants do challenge whether Zloop has alleged the second and third elements of any such claim.

84.     As to the second element, the Court concludes that the element requires actual, not implied, knowledge of the underlying breach of fiduciary duty. *See Blow,* 88 N.C. App. at 493, 364 S.E.2d at 449 (approving jury instructions in which the judge told the jury that "[y]ou'd have to know about the fraud"); *Ivey v. Crown Mem'l Park, LLC*, 333 B.R. 76, 80 (Bankr. M.D.N.C. 2005) ("An alleged aider and abettor must have actual knowledge of the breach of the fiduciary's duty."); *Kolbeck v. LIT Am.*, 939 F. Supp. 240, 246, (S.D.N.Y. 1996) ("[A]ctual knowledge is necessary to impose liability for participating in a breach of fiduciary duty."). The knowledge element includes a degree of scienter. Before his retirement from this court, Judge Ben Tennille observed that "there is not a lower level of culpability or scienter for aiding and abetting than for the underlying tort." *Sompo Japan*, 2005 NCBC LEXIS

1, at \*11–12; *see also, Tong*, 2012 NCBC LEXIS 16, at \*26 ("[I]t is clear that the primary party and the aiding and abetting party must have the same level of culpability or scienter."). He further noted that an aiding-and-abetting claim is best conceptualized as a "vehicle to accomplish liability for *equally culpable acts*." *Sompo Japan*, 2005 NCBC LEXIS 1, at \*11 (emphasis added). The Court adopts Judge Tennille's reasoning.

85.     The third element of an aiding-and-abetting claim grounded on Section 876 is that the aider-abettor must have lent "*substantial* assistance or encouragement" to the achievement of the breach of fiduciary duty. Restatement (Second) of Torts § 876(b) (Am. Law Inst. 1979) (emphasis added). When addressing the claim in a securities context, the North Carolina Court of Appeals recognized that this element requires a "showing of [a] 'substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff, or a showing that the encouragement or assistance is a substantial factor in causing the resulting tort.'" *Blow*, 88 N.C. App. at 491, 364 S.E.2d at 447–48 (quoting *Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985)). The Court concludes that proving a "substantial causal connection" is a higher burden than the burden for other claims requiring only proof of "a proximate cause." *Compare* Restatement (Second) of Torts § 876(b) (Am. Law Inst. 1979) *and Blow*, 88 N.C. App. at 491, 364 S.E.2d at 447–48 *with* North Carolina Pattern Jury Instructions, General Civil Vol. No. 1, § 102.19 (2017) ("Proximate cause is a cause which in a natural and continuous sequence produces a person's injury . . . There may be more than one proximate cause of injury.

Therefore, the plaintiff need not prove that the defendant's negligence was the sole proximate cause of the injury.") *and* Prosser & Keeton on Torts 265–67 (5th ed. 1984) (discussing the but-for and substantial factor tests for determining whether a defendant's acts proximately caused a plaintiff's injury).

86.     Comment d of Section 876 outlines factors that courts may consider in determining whether a party's assistance rises to the level of "substantial assistance," including: the nature of the act encouraged, the amount of assistance given by the defendant, the defendant's presence or absence at the time of the tort, his relation to the primary tortfeasor, and the defendant's state of mind.  Restatement (Second) of Torts § 876(b), cmt.d (Am. Law Inst. 1979); s*ee also, e.g.*, *In re TMJ Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1495 (8th Cir. 1997); *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983); *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 800 (3d Cir. 1978) (analyzing the factors enumerated in Section 876's Comment d).

87.     Other courts have recognized that "substantial assistance" must mean more than mere assistance.  *See, e.g.*, *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 391 (S.D.N.Y. 2007) (holding that Bank of America had not "substantially assisted" a massive fraud, even though its accounts were used to perpetrate the scheme and it violated its own internal policies and federal regulations in approving fraudulent transactions); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007) (noting that a bank's violations of law did not in that case elevate its actions "into the realm of 'substantial assistance'").

88.     The substantial assistance requirement has arisen in cases brought against lawyers accused of having aided and abetted a client's breach of fiduciary duty.  As one court recognized, in that context, "substantial assistance means something more than the provision of routine professional services."  *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 503 (N.D. Ind. 2014) (quoting *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 Fed. App'x 636, 643 (2d Cir. 2012).  Another court has recognized that the fact that attorneys may, at the direction of their clients during the course of representation, draft documents that prove to be misleading does not necessarily constitute substantial assistance.  *Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991) (noting that "the 'substantial assistance' element requires that a lawyer be more than a scrivener for a client . . . While it is true that some of [the primary wrongdoer]'s documents prepared by [the law firm] (on the basis of information provided by [the primary wrongdoer]) were misleading, this fact alone does not meet the 'substantial assistance' threshold.").  Further, some courts have held that an attorney's silence to aid his client's fraud does not constitute substantial assistance.  *See Varga*, 952 F. Supp. 2d at 860 ("[F]ailing to alert others cannot constitute substantial assistance as a matter of law."); *Quintel Corp. v. Citibank,* 589 F. Supp. 1235, 1245 (S.D.N.Y.1984) (allegations that attorney remained silent to aid his client's fraud did not adequately plead an aider-and-abettor claim because the plaintiff never alleged that the attorney "had a direct involvement in the transaction or deliberately covered up the fraud"); *but see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) ("[T]he mere inaction of an alleged aider and abettor

constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.").

89.     Courts have also found that the substantial assistance necessary to support a lawyer's liability as an aider and abettor must be directly related to the underlying breach of fiduciary duty on which the aiding and abetting claim is based, in that the assistance must be directed at the "primary . . . violation, *not merely to the person committing the violation.*"  *Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991) (noting that the substantial assistance element in an aiding-and-abetting securities fraud claim required "that the lawyer . . . *actively participate* in soliciting sales or negotiating terms of the deal on behalf of a client") (emphasis added); *Quintel,* 589 F. Supp. at 1245.  As the *Schatz* court explained,

> [i]f a lawyer, for example, is a member of the investment group, acts as a general agent for the investment group and not merely its attorney, or *actively participates in the transaction by inducing or soliciting sales or by negotiating terms of the deal*, the lawyer may be held liable for substantially assisting a securities violation. However, when a lawyer offers no legal opinions or affirmative misrepresentations to the potential investors and merely acts a scrivener for the investment group, the lawyer cannot be liable as a matter of law for aider and abettor liability . . . .

*Schatz*, 943 F.2d at 497 (emphasis added).

90.     In contrast, the Court of Appeals for the Third Circuit held that a plaintiff had sufficiently alleged that the defendant law firm went "beyond the bounds of permissible advocacy" in an attempt to help their client avoid paying a judgment by knowingly creating and recording a sham lease, preparing and recording a "corrective" lease, and writing a letter to the county clerk's office misrepresenting the

effect of a court order. *Morganroth*, 331 F.3d at 412. On those facts, the court held that the plaintiff adequately alleged that the defendant law firm "actively, knowingly, and intentionally participated in their client's unlawful efforts to avoid execution on his property" and allowed the plaintiff's aiding-and-abetting claims to survive 12(b)(6). *Id.* at 408, 414.

91. These cases teach that, should a claim of aiding and abetting breach of fiduciary duty be first recognized as a basis for asserting liability against counsel, the claim will demand proof that the attorney lent substantial assistance to the breach on which the claim is based beyond merely providing routine legal services, acting as a scrivener, or remaining silent absent a duty to disclose. However, an attorney may be liable for aiding and abetting his client's breach of fiduciary duty if he "actively participates" in the conduct constituting the underlying breach of fiduciary duty. *Schatz*, 943 F.2d at 497.

**(4)** **Zloop has not adequately alleged the essential elements of any aiding and abetting breach of fiduciary duty claim that may be recognized in North Carolina.**

92. The Court has concluded that North Carolina does not recognize a claim for aiding and abetting breach of fiduciary duty. That conclusion alone requires that Zloop's aiding-and-abetting claim be dismissed. The Court alternatively holds that even if such a claim may be recognized in the first instance, Zloop has, as a matter of law, failed to allege the essential elements of such a claim.

93. Zloop alleges that Boston and LaBarge breached their fiduciary duties to Zloop by (1) failing to act in best interests of Zloop, (2) circulating materially false

documents, (3) requesting that Parker Poe make a friends and family offering, (4) fabricating the bogus UCC-1, (5) obtaining for themselves the benefits of Mosing's investments, and (6) not recommending that a lawsuit be filed against themselves. (Am. Compl. ¶ 132; *see also* Am. Compl. ¶¶ 34, 47, 96, 104, 111.) To survive Rule 12(c), Zloop's allegations must tie Defendants' assistance to those breaches, and the assistance must be knowing and substantial.

94. Accepted as true, the allegations of the Amended Complaint detail that Defendants had actual knowledge of at least some of Boston's and LaBarge's wrongdoing, including that they had broken escrow, (Am. Compl. ¶¶ 37, 42), misled investors, (Am. Compl. ¶¶ 56, 60), and engaged in self-dealing. (Am. Compl. ¶ 99.) Construed liberally, Zloop's allegations may be read to allege that Defendants acted with scienter equal to Boston and LaBarge. (*See, e.g.*, Am. Compl. ¶ 134 (o), (q), (s).) Whether Zloop's Amended Complaint survives the Motion depends on whether it has adequately alleged facts which, if accepted as true, rise to the level of substantial assistance tied to the underlying breaches of fiduciary duty.

95. The Amended Complaint alleges that Defendants substantially assisted Boston and LaBarge's underlying breaches of duty in at least twenty-three ways. (Am. Compl. ¶ 134.) These allegations can be segregated between complaints that Defendants' failed to act, provided routine legal services to Zloop, and affirmatively assisted Boston and LaBarge in gaining control over Zloop necessary to accomplish their wrongful purposes.

96.     The Court acknowledges but need not resolve the question of whether inaction can ever constitute substantial assistance for purposes of an aiding and abetting breach of fiduciary duty claim. *Compare Lerner*, 459 F.3d at 295 (holding that inaction constitutes substantial assistance "only if the defendant owes a fiduciary duty directly to the plaintiff"), *with Varga*, 952 F. Supp. 2d at 859 ("[F]ailing to alert others cannot constitute substantial assistance as a matter of law."). Without resolving that issue, the Court concludes that, under the particular facts of this case, Zloop's allegations based solely on Defendants' failures to act do not rise to the level of "substantial assistance" required for an aiding-and-abetting claim. *See Bottom v. Bailey*, 238 N.C. App. 202, 212, 767 S.E.2d 883, 889 (2014) (holding that an allegation that a party was merely "aware" of fraudulent acts was insufficient to survive 12(b)(6)); *see also Varga*, 952 F. Supp. 2d at 859; *Quintel,* 589 F. Supp. at 1245.

97.     The Court further concludes that Zloop's allegations complaining of Defendants' performance of routine legal services, including allegations that Defendants: continued to represent Zloop; drafted and prepared documents that perpetuated Boston and LaBarge's majority ownership; created PPMs and other documents that proved to be false or misleading; created Boston and LaBarge's share certificates that were void; and proposed that Zloop buy back franchises with proceeds from a debt offering, (Am. Compl. ¶ 134 (f), (j), (m), (q), (t), (v)–(w)), likewise do not constitute "substantial assistance." *See Abrams*, 518 B.R. at 503 (performing routine legal services is not substantial assistance); *Schatz*, 943 F.2d at 497 (drafting

documents, at client's direction, that prove to be misleading is not substantial assistance).

98.     The Court also concludes that Zloop's allegations of Defendants' affirmative, intentional acts do not constitute substantial assistance.  These allegations include:

- "attempting to dissuade the Independent Officers from action by excusing Boston and LaBarge's thefts and illegally breaking escrow as mere 'gaps in the corporate records'" (Am. Compl. ¶ 134(n));

- "siding with Boston and LaBarge, and advising them not to acquiesce to the Independent Officers' demands that they cede control, when presented with overwhelming evidence of Boston and LaBarge's pervasive and ongoing wrongdoing" (Am. Compl. ¶ 134(o));

- "intentionally denying and frustrating the rights of the actual stockholders of Zloop to elect its directors upon its conversion to a corporation" (Am. Compl. ¶ 134(r));

- "unilaterally installing Boston and LaBarge as the directors of Zloop with full knowledge that they had engaged in pervasive wrongdoing to the detriment of Zloop, and that they were likely to continue to do so as long as they had the means and opportunity" (Am. Compl. ¶ 134(s)); and

- "intentionally frustrating changes in the management and controls of Zloop that would have ended Boston and LaBarge's ability to steal from the company." (Am. Compl. ¶ 134(u).)

99. Admittedly, these allegations certainly raise troubling issues of professional malpractice. However, the Court is not persuaded that they rise to the level of "substantial assistance" that North Carolina appellate courts would impose as an essential element of any aiding and abetting breach of fiduciary duty claim because (1) those acts are not adequately tied as a causative factor to *the underlying breaches* of fiduciary duty on which the claim is based and (2) the Louisiana Amended Complaint demonstrates that any assistance Defendants rendered, even if sufficiently tied to the underlying breaches, was not substantial.

100. As discussed above, a plaintiff must allege "that a[n aider-abettor] rendered 'substantial assistance' *to the primary . . . violation, not merely to the person committing the violation.*" *Schatz*, 943 F.2d at 497 (4th Cir. 1991) (emphasis added). Stated otherwise, Defendants must have had "*direct involvement in the transaction*" or have deliberately covered up the fraud. *Quintel,* 589 F. Supp. at 1245 (emphasis added); *see also Morganroth*, 331 F.3d at 412, 414.

101. Zloop's allegations of Defendants' affirmative acts fall short of those in *Morganroth*, where the law firm itself filed false deeds and lied to a government official. 331 F.3d at 412–13. Rather, Zloop alleges here only that Parker Poe's affirmative and knowing acts gave Boston and LaBarge the *opportunity to do those kinds of things themselves. See Schatz*, 943 F.2d at 497 (noting that a plaintiff must allege "that a[n aider-abettor] rendered 'substantial assistance' *to the primary . . . violation, not merely to the person committing the violation*") (emphasis added). Zloop does not allege or suggest facts that Parker Poe encouraged, was directly involved in,

or otherwise substantially assisted Boston and LaBarge in their breaking escrow, siphoning Mosing's funds for personal use, or filing a fraudulent UCC-1. The lack of allegations regarding Defendants' direct participation in the underlying frauds likely compels a finding that Zloop's allegations of Defendants' wrongs do not constitute substantial assistance.

102. If the Court were restricted to a review of only the Amended Complaint, liberal Rule 12(c) standards might argue in favor of deferring critical analysis of Zloop's claim until a summary judgment motion is presented under Rule 56. However, Zloop's own allegations in the Louisiana Lawsuit defeat any inferences in Zloop's favor that the Rule 12(c) standard might arguably require.

103. The Louisiana Amended Complaint provides further details of Boston's and LaBarge's conduct—and the control they maintained over Zloop—that make clear that Boston and LaBarge did not depend on Defendants for that control and that Defendants' acts did not substantially assist their wrongdoing even though Defendants took certain actions in the course of the wrongdoing.

104. In the Louisiana Amended Complaint, Zloop alleges that Boston and LaBarge completely controlled Zloop and committed fraud at "all relevant times," (LA Am. Compl. ¶¶ 4, 5), including before June 19, 2013, when Parker Poe began representing Zloop, and after February 2015, when Parker Poe's representation ended. (*See* Am. Compl. ¶ 23 (representation begins), ¶ 108 (representation ends).)

105. For example, Zloop alleges that on March 11, 2013, *before* Defendants represented Zloop, "there was no board of directors for [Zloop], only two managing

members who had *total control* of the same: LaBarge and Boston." (LA Am. Compl. ¶ 49 (emphasis added); *see also, e.g.*, LA Am. Compl. ¶¶ 13–16 (alleging that between September 23, 2012 and October 2, 2012, Boston and LaBarge mailed franchise-related documents to Mosing or Mosing's advisor without including a franchise disclosure document, in violation of state and federal law); LA Am. Compl. ¶¶ 19–22 (alleging that on October 4, 2012, Boston and LaBarge promulgated a materially incorrect franchise disclosure document); LA Am. Compl. ¶¶ 27–28 (alleging that on October 5 and 15, 2012, Boston and LaBarge violated state and federal securities laws by failing to disclose certain information in franchise documents); LA Am. Compl. ¶¶ 57, 59 (alleging that Boston and LaBarge broke escrow before May 10, 2013).)

106.    Zloop further alleges that Boston and LaBarge dominated Zloop and committed fraud *after* Defendants ceased representing them, alleging that Boston and LaBarge "controlled Zloop until [September 24, 2015, when] the [chief restructuring officer] was appointed." (LA Am. Compl. ¶¶ 139, 159; *see also* LA Am. Compl. ¶ 130 (alleging that on March 9, 2015, after Parker Poe's representation ended, Boston and LaBarge nefariously used Zloop to take out an equity loan secured by property purchased using Mosing's funds).) According to the Louisiana Amended Complaint, Boston and LaBarge "exerted *complete control over Zloop* and were the agents of action for the acts complained of herein." (LA Am. Complaint ¶ 167 (emphasis added).)

107.    In sum, Zloop alleges in the Louisiana Amended Complaint that Boston and LaBarge completely and continuously controlled Zloop and committed fraud

*before, during, and after* Parker Poe represented them. Those allegations defeat any finding or inference that Defendants were the substantial cause of or lent substantial assistance to Boston and LaBarge's breaches of fiduciary duties. *See Blow* at 491, 363 S.E.2d at 448; *see also* Restatement (Second) of Torts § 876 cmt.d (Am. Law Inst. 1979) ("The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other."). The fact that Defendants' undertakings may have had some additive effect is not adequate to constitute the substantial assistance necessary for any aiding and abetting breach of fiduciary claim. *Self v. Yelton*, 201 N.C. App. 653, 659, 688 S.E.2d 34, 38 (2010) (quoting *Brown v. Neal*, 283 N.C. 604, 611, 197 S.E.2d 505, 509 (1973) ("[B]efore holding a defendant liable for an injury to a plaintiff, it must be shown that defendant's actions were a *substantial factor* of the *particular* injuries for which plaintiff seeks recovery.") (first emphasis added).

108. Accordingly, the Court concludes that Zloop's allegations, viewed collectively and accepted as true, reveal that Zloop has not alleged the essential elements of any aiding and abetting breach of fiduciary duty claim that may ultimately be recognized in North Carolina.

## VI. CONCLUSION

109. The Court does not by this Order & Opinion make any ruling or express any opinion as to whether Defendants met or failed to meet their professional standards of conduct as corporate counsel. Rather, it holds that because Zloop's own allegations dictate that Boston's and LaBarge's acts must be imputed to Zloop, the doctrine of *in pari delicto*, the elements of which are fully made out on the pleadings

alone, bars Zloop's legal malpractice and breach of fiduciary duty claims as a matter of law.

110. The Court holds that North Carolina does not recognize a claim for aiding and abetting breach of fiduciary duty. Alternatively, the Court concludes that Zloop has, as a matter of law, failed to allege the essential elements of any such claim that may be recognized.

111. The Court need not reserve its ruling in anticipation of a further amended complaint Zloop might seek to file based on additional information learned from criminal proceedings involving Boston and LaBarge. For the foregoing reasons, the Court GRANTS Defendants' Motion and the Amended Complaint is DISMISSED WITH PREJUDICE.

SO ORDERED, this the 16th day of February, 2018.

/s/ James L. Gale

James L. Gale
Chief Business Court Judge